## KECK *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

No. 15. Argued November 16, 1898. — Decided January 9, 1899.

An indictment based upon that portion of Rev. Stat. § 3082, which makes it an offence to "fraudulently or knowingly import or bring into the United States, or assist in doing so, any merchandise contrary to law," charging that the defendant, on a date named, "did knowingly, wilfully and unlawfully import and bring into the United States, and did assist in importing and bringing into the United States, to wit, into the port of Philadelphia," diamonds of a stated value, "contrary to law, and the provisions of the act of Congress in such cases made and provided" is clearly insufficient, as the allegations are too general, and do not sufficiently inform the defendant of the nature of the accusation against him.

An indictment for a violation of Rev. Stat. § 2865, which charges that the defendant "did knowingly, wilfully and unlawfully, and with intent to defraud the revenue of the United States, smuggle and clandestinely introduce into the United States, to wit, into the port of Philadelphia," certain "diamonds" of a stated value, which should have been invoiced and duty thereon paid or accounted for, but which, to the knowledge of the defendant and with intent to defraud the revenue, were not invoiced

nor the duty paid or accounted for, sufficiently describes the offence to make it clear what articles were charged to have been smuggled.

Under the tariff act of 1894, c. 349, diamonds were subject to duty.

Mere acts of concealment of merchandise, on entering the waters of the United States, do not, taken by themselves, constitute smuggling or clandestine introduction.

The offence described in Rev. Stat. § 2865, is not committed by an act done before the obligation to pay or account for the duties arises.

The word "smuggling" had a well understood import at common law; and, in the absence of a particularized definition of its significance in the statute creating it, resort may be had to the common law for the purpose of arriving at its meaning.

A review of the principal statutes enacted in this country regulating the collection of customs duties establishes that, so far as they embraced legislation designed to prevent the evasion of duties, they proceeded upon the theory of the English law on the same subject; that is, that they forbade all the acts which were deemed by the lawmaker means to the end of smuggling, or clandestinely introducing dutiable goods into the country in violation of law, and which were likewise considered as efficient to enable the offender to reap the benefits of his wrongful acts; and that therefore they forbade and prescribed penalties for everything which could precede smuggling or follow it, without specifically making a distinct and separate offence designated as smuggling, or clandestine introduction.

Whether we consider the testimony of the captain alone, or all the testimony contained in the record, it unquestionably establishes that there was no passage of the package of diamonds through the lines of the customs authorities, but, on the contrary, that the package was delivered to the customs officer on board the vessel itself, at a time when or before the obligation to make entry and pay the duties arose, and that the offence of smuggling was not committed within the meaning of the statute.

THIS case was first argued on the 18th of December, 1896. On the 18th of January, 1897, it was restored to the docket for reargument, with leave to submit to the full bench on printed briefs at any time prior to the first Monday of the next March. On the 15th of February, 1897, a motion to fix a day for reargument, made by *Solicitor General Conrad* on the 1st of that month, was granted, and the case was assigned for argument on the second Monday of the next term. On the 19th and 20th of January, 1898, the case was reargued. On the 7th of the following March it was announced that the judgment below was affirmed by a divided court. On the 21st

of the same month it was announced that a motion for rehearing, in order to allow the submission of the cause to a full bench, was granted, and that the cause was taken on submission. On the 25th of April, 1898, the cause was restored to the docket for reargument, and assigned for argument on the second Monday of the next term. On the 10th of November, 1898, it was reargued.

The case then made is stated in the opinion.

*Mr. Francis B. James* for plaintiff in error. *Mr. Rankin Dilworth Jones* was on his brief.

*Mr. James M. Beck* for defendants in error. *Mr. Assistant Attorney General Hoyt* was on his brief.

MR. JUSTICE WHITE delivered the opinion of the court.

The plaintiff in error was prosecuted under an indictment consisting of three counts. The first was intended to charge a violation of section 3082 of the Revised Statutes, by the alleged unlawful importation into the port of Philadelphia of certain diamonds. The second averred a violation of section 2865 of the Revised Statutes, by the smuggling and clandestine introduction, on the like date, and into the same port, of the articles which were embraced in the first count. The third count need not be noticed, since as to it the trial judge, at the close of the evidence, instructed the jury to return a verdict of not guilty.

The sufficiency of the first and second counts was unsuccessfully challenged by the accused, both by motion to quash and by demurrer. The jury returned a general verdict of guilty; and, after the court had overruled motions for a new trial and in arrest of judgment, the accused was duly sentenced. Error was prosecuted, and the case is here for review.

The assignments of error are numerous, but we need only consider the questions as to the sufficiency of the first and second counts of the indictment and the propriety of the conviction under the second count.

*Was the first count sufficient?*

This count was based upon that portion of section 3082 of the Revised Statutes, which made it an offence to "fraudulently or knowingly import or bring into the United States, or assist in doing so, any merchandise, contrary to law."

It was charged in the count that Keck, on the date named, "did knowingly, wilfully and unlawfully import and bring into the United States, and did assist in importing and bringing into the United States, to wit, into the port of Philadelphia," diamonds of a stated value, "contrary to law and the provisions of the act of Congress in such cases made and provided, with intent to defraud the United States."

As is apparent, the alleged offence averred in this count was charged substantially in the words of the statute. In the argument at bar counsel for the United States conceded the vagueness of the accusation thus made; and, tested by the principles laid down in *United States* v. *Carll,* 105 U. S. 611, 612; *United States* v. *Hess,* 124 U. S. 483; and *Evans* v. *United States,* 153 U. S. 584, 587, the count was clearly insufficient. The allegations of the count were obviously too general, and did not sufficiently inform the defendant of the nature of the accusation against him. The words "contrary to law," contained in the statute, clearly relate to legal provisions not found in section 3082 itself, but we look in vain in the count for any indication of what was relied on as violative of the statutory regulations concerning the importation of merchandise. The generic expression, "import and bring into the United States," did not convey the necessary information, because importing merchandise is not *per se* contrary to law, and could only become so when done in violation of specific statutory requirements. As said in the *Hess case,* at p. 486:

"The statute upon which the indictment is founded only describes the general nature of the offence prohibited, and the indictment, in repeating its language without averments disclosing the particulars of the alleged offence states no matters upon which issue could be formed for submission to a jury."

*As to the sufficiency of the second count.*

In this count it was charged in substance that Keck "did knowingly, wilfully and unlawfully, and with intent to defraud the revenue of the United States, smuggle and clandestinely introduce into the United States, to wit, into the port of Philadelphia," certain "diamonds" of a stated value, which should have been invoiced and duty thereon paid or accounted for, but which, to the knowledge of Keck and with intent to defraud the revenue, were not invoiced nor the duty paid or accounted for.

Two objections were urged against this count: first, that diamonds, under the law then in force, were on the free list, and hence not subject to duty; and, second, that if all diamonds were not on the free list, at least some kinds of diamonds were on such list, and the count should therefore have specifically enumerated the kinds or classes of diamonds which were subject to duty by law.

With respect to the first objection, counsel for plaintiff in error contends that all diamonds were free of duty, because of the following provision contained in the free list of the tariff act of August 27, 1894, c. 349, 28 Stat. 509, to wit:

"Par. 467. Diamonds; miners', glaziers' and engravers' diamonds not set, and diamond dust or bort, and jewels to be used in the manufacture of watches or clocks."

Paragraph 338 imposes duties as follows:

"Precious stones of all kinds, cut but not set, twenty-five per centum ad valorem; if set, and not specially provided for in this act, including pearls set, thirty per centum ad valorem; imitations of precious stones, not exceeding an inch in dimensions, not set, ten per centum ad valorem. And on uncut precious stones of all kinds, ten per centum ad valorem."

It is apparent that it was not the intention of Congress to put one of the most valuable of precious stones on the free list, while all others were made dutiable. The word "diamonds," which is but the commencement of paragraph 467, was plainly designed as a heading, for convenient reference, and the semicolon following should be read as though a colon.

The other ground of objection to the second count is con-

trolled by the decision in *Dunbar* v. *United States*, 156 U. S. 185. In that case, paragraph 48 of section 1 of the tariff act of 1890 provided that opium containing less than nine per cent of morphia, and opium prepared for smoking, should be subject to a duty of twelve cents per pound. Counts charging the smuggling of "prepared opium . . . subject to duty by law, to wit, the duty of twelve cents per pound," were held to sufficiently describe the smuggled goods. Here, as in the *Dunbar case*, the words of description made clear to the common understanding what articles were charged to have been smuggled; and, for that reason, we hold the objection just considered to be without merit.

*Was the conviction under the second count of the indictment proper?*

The principal witness for the government was one Frank Loesewitz, a resident of Antwerp, Belgium, and captain of the steamer Rhynland, of the International Navigation Company, which vessel plied between Philadelphia and Liverpool. He testified, in substance, that on January 21, 1896, late in the afternoon, while at the residence of one Franz von Hemmelrick, a jeweller in Antwerp, he for the first time met the accused; that in his company and that of Von Hemmelrick he went to a café in the neighborhood; that during the conversation which followed Von Hemmelrick took from his pocket a small package and handed it to the witness with the statement, made in the hearing of Keck, that it belonged "to that gentleman here" (Keck); that it did not contain any valuables, and Von Hemmelrick asked the witness to oblige him by taking it over to America. The captain further testified that Keck also said that the package did not contain any valuables. The witness asked Keck where he wished the package sent, whereupon he tore off a piece of card which was lying on the table, and wrote on it the address of a person in Cincinnati, whom it subsequently developed was associated in the diamond business with Keck. The card and the package in question were produced in court and identified by the witness. Subsequently, on leaving the place, Keck requested the witness to send the package to Cincinnati from

Philadelphia by Adams Express.   There was no address upon
the package, and the card handed by Keck to the witness was
placed by him in his pocket book or card case.   Soon after, the
witness crossed to Liverpool and joined his vessel there.   The
package was by him placed in a drawer in his (the captain's)
room, where it remained undisturbed until the arrival of the
ship at her dock in Philadelphia.   Just as the vessel was ap-
proaching her moorings, a special agent of the Treasury De-
partment boarded her.   This special agent thus describes in
his testimony what then ensued :

"Acting on information received that, at the instance of
Herman Keck, the captain of the Rhynland had endeavored
to smuggle diamonds, I met the steamship Rhynland upon
her arrival here on the eleventh day of last February, about
four or five o'clock in the afternoon.   I went aboard and ex-
amined the passenger list to see if Keck was on board, or any
one under that name, and I also examined the manifest to
find if there were any diamonds.   I found no one particularly
on the passenger list corresponding to the name of Herman
Keck, and no diamonds appeared on the manifest.

"The weather was very rough that day, and the boarding
officers boarded just as she was coming into the dock.   I
then asked one of the custom inspectors to examine closely
the baggage of one or two of the cabin passengers, whom I
suspected, to ascertain whether they had any large quantity
of jewelry, after which I went into the chart room where the
captain was with Special Agent Cummings."

What occurred in the chart room between the captain and
the special agent of the Treasury Department is thus testified
to by the captain :

"When I reached the port of Philadelphia, after the pas-
sengers were landed, two gentlemen entered my room, and
they said they had information from Antwerp that I had a
package to a friend to send it to Cincinnati.   I said right
away, 'Yes.'   I thought those gentlemen came for the pack-
age, and that they were sent by Mr. Keck, and, naturally, on
my part, I asked them who they were.   They said they were
Treasury agents, and said, 'Captain, that's a package of dia-

monds you have got, to be sent to Cincinnati,' and if I didn't deliver it I would be arrested. After awhile I went down in my room and brought the package up and delivered it over to the Treasury agents. That's all that happened."

The special agent thus states what passed in the chart room :

"I spoke of the weather and other topics, and then I said : 'Captain,' — to whom I was unknown — 'you have a package for the Coeterman Diamond Company, the Coeterman-Keck Diamond Company, 24 West Fourth street, Cincinnati, Ohio ?' I repeated the name of the company. He said, 'No ; I have no such package.' I said, 'I beg leave to differ with you ;' and, indicating with my fingers, I said, 'You have a small package which you received while in Antwerp.' He said, 'I have a package for Van Reeth, of 21 West Fourth street, Cincinnati, Ohio, and I will give it to you if you have an order for it.'

"At that time, I understand you to say he did not know you were a Treasury agent ?

"No, sir ; I was unknown.

"Had you ever met him before ?

"Never met him before to know him.

"I then said, 'Captain, I have an order for them.' He said, 'Show me the order, and I will go and get the package.' I replied, 'Captain, I would like to see the package first before delivering the order, and I want to speak to you in private.'

"Was there anything on your clothes like a badge or anything else to show what you were ?

"No, sir ; none whatever. He was doing some writing at the time — I think finishing the log — and he asked me to wait until he finished, and I said, 'Certainly.' After the lapse of about five minutes the captain arose and said, 'You remain here, and I can go and get the package.' As soon as the captain left the chart room I quietly and unperceived by him followed him, and saw him enter his room, and just as he emerged he had a package in his hand. As soon as I saw it I said, 'Captain, that is the package I want.' He said, 'Where is your order ?' I produced my card as United States Treasury agent.

He refused to let me have it until I was identified as a custom house officer. A young man (being) present at the conversation opposite the captain's room, who represented the steamship company, we agreed to go back to the chart room, where I again insisted on getting this package, and this young man who represented the steamship company, who was present, advised the captain to give the package to me, which the captain did."

The package referred to was found to contain five hundred and sixty-three cut diamonds of the value of about seven thousand dollars, which were subject to a duty of twenty-five per cent. The diamonds were subsequently sold under forfeiture proceedings instituted by the government, and no claimant for them appeared.

Exception was taken on behalf of the accused to the following instruction given by the trial judge to the jury : "If the statements made here under oath by Captain Loesewitz respecting his receipt of the package of diamonds in Antwerp and bringing them here are true, the defendant is guilty of the offence charged." An exception was also noted to the refusal of the court to direct the jury to return a verdict of not guilty upon the second count, and the questions reserved by these two exceptions are pressed as clearly giving rise to reversible error.

The contention on behalf of the accused is that there was error in refusing to instruct a verdict and in the instruction given as to the captain's testimony, because even although all the acts of the captain of the Rhynland done in relation to the package of diamonds were believed by the jury to be imputable to Keck, they did not constitute the offence of smuggling within the intendment of the statute. At best, it is argued, the legal result of the testimony was to show only an unexecuted purpose to smuggle, a concealment of the diamonds on the ship, and a failure to put them on the manifest of the vessel, all of which, although admitted to be unlawful acts subjecting to a penalty and entailing forfeiture of the goods, were not, it is claimed, in themselves alone the equivalent of the crime of smuggling or clandestine introduction

which the indictment charged. This crime, it is insisted, is a specific offence arising from the evasion of custom duty by introducing goods into the United States without making entry thereof and without paying or securing payment of the duties, and thus passing them beyond the line of the customs authorities, where the obligation to pay the duty arose, and is not, consequently, established by proving antecedent acts of concealment preparatory to the commission of the overt act of smuggling when these antecedent acts were not followed by the introduction of the goods into the United States, but where, on the contrary, the goods, before or at the time when the obligation to pay the duty arose, were surrendered to the customs authorities.

The United States, on the contrary, maintains that the facts were sufficient to justify a conviction for smuggling or clandestine introduction, as those words embrace all unlawful acts of concealment·or other illegal conduct tending to show a fixed intent to evade the customs duty by subsequently passing the goods through the jurisdiction of the customs officials without paying the duties imposed by law thereon. It is hence contended by the prosecution that the crime ·of smuggling or clandestine introduction was complete if the acts of concealment were in existence when the vessel entered the waters of the United States, even although at such time the period for making entry and paying or securing the duties had not arisen and even although subsequently and before or at the time when the obligation to make entry and pay duties arose the goods were delivered to the customs authorities.

The questions for determination, therefore, are: Did the testimony of the captain justify the court in giving the instruction that there was a legal duty to convict, if the jury believed such testimony? and, did the court, admitting the testimony of the special agent to be true, err in refusing to instruct a verdict as requested?

The charge of smuggling was based on section 2865, Revised Statutes, which is as follows:

"If any person shall knowingly and wilfully, with intent to defraud the revenue of the United States, smuggle, or

clandestinely introduce, into the United States, any goods, wares or merchandise, subject to duty by law, and which should have been invoiced, without paying or accounting for the duty, or shall make out or pass, or attempt to pass, through the custom house, any false, forged or fraudulent invoice, every such person, his, her or their aiders and abettors, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in any sum not exceeding five thousand dollars, or imprisoned for any term of time not exceeding two years, or both at the discretion of the court."

This section in its complete state is but a reproduction of section 19 of the tariff act of August 30, 1842, c. 270, 5 Stat. 548, 565. That portion of the section which made it an offence to smuggle or clandestinely introduce articles into the United States was omitted in the revision of 1874, but the act of February 27, 1877, c. 69, 19 Stat. 240, 247, which recites that it was enacted "for the purpose of correcting errors and supplying omissions in the revision," reinstated the omitted clause by an amendment to section 2865.

Whatever may be the difficulty of deducing solely from the text of the statute a comprehensive definition of smuggling or clandestine introduction, two conclusions arise from the plain text of the law : First. That whilst it embraces the act of smuggling or clandestine introduction, it does not include mere attempts to commit the same. Nothing in the statute by the remotest possible implication can be found to cover mere attempts to commit the offence referred to. It was indeed argued at bar that as the concealment of goods at the time of entering the waters of the United States tended to render possible a subsequent smuggling, therefore such acts should be considered and treated as smuggling; but this contention overlooks the plain distinction between the attempt to commit an offence and its actual commission. If this premise were true, then every unlawful act which had a tendency to lead up to the subsequent commission of an offence would become the offence itself; that is to say, that one would be guilty of an offence without having done the overt act essential to create the offence, because something had been done which, if

carried into further execution, might have constituted the crime. Second. That the smuggling or clandestine introduction of goods referred to in the statute must be "without paying or accounting for the duty," is also beyond question.

From the first of the foregoing conclusions it follows that mere acts of concealment of merchandise on entering the waters of the United States, however preparatory they may be and however cogently they may indicate an intention of thereafter smuggling or clandestinely introducing, at best are but steps or attempts not alone in themselves constituting smuggling or clandestine introduction. From the second, it results that as the words, "without paying or accounting for the duty" imply the existence of the obligation to pay or account at the time of the commission of the offence, which duty is evaded by the guilty act, it follows that the offence is not committed by an act done before the obligation to pay or account for the duties arises, although such act may indicate a future purpose to evade when the period of paying or securing the payment of duties has been reached. If this were not a correct construction of the statute, it would result that the offence of smuggling or clandestine introduction might be committed as to goods, although entry of such goods had been made and all the legal duties had been paid before the goods had been unshipped. The soundness of the deductions which we have above made from the statute is abundantly demonstrated by the line of argument which it has been necessary to advance at bar to meet the dilemma which the contrary view necessarily involves. For, although it was contended that the offence was complete the moment the concealment existed when the ship arrived within the waters of the United States, it was yet conceded that if in legal time the duties were subsequently paid or secured, there would have been no offence committed. But the contention and the admission are completely irreconcilable, since if the subsequent act becomes necessary in order to determine whether an offence has been committed, it cannot in reason be said that the offence was complete and had been committed before the subsequent and essential act had taken place.

These conclusions arising from a consideration of the text of the statute are rendered yet clearer by taking into view the definite legal meaning of the word "smuggling." That term had a well understood import at common law, and in the absence of a particularized definition of its significance in the statute creating it, resort may be had to the common law for the purpose of arriving at the meaning of the word. *Swearingen* v. *United States*, 161 U. S. 446, 451; *United States* v. *Wong Kim Ark*, 169 U. S. 649.

Russell, in his work on Crimes (Vol. I, p. 277, 6th English edition), thus speaks of the offence:

"Amongst the offences against the revenue laws, that of *smuggling* is one of the principal. It consists in bringing on shore, or carrying from the shore, goods, wares or merchandise, for which the duty has not been paid, or goods of which the importation or exportation is prohibited: an offence productive of various mischiefs to society."

This definition is substantially adopted from the opening sentence of the title "Smuggling and Customs" of Bacon's Abridgment, and in which, under letter F, it is further said:

"As the offence of smuggling is not complete unless some goods, wares or merchandise are actually brought on shore or carried from the shore contrary to law, a person may be guilty of divers practices which have a direct tendency thereto, without being guilty of the offence.

"For the sake of preventing or putting a stop to such practices, penalties and forfeitures are inflicted by divers statutes; and indeed it would be to no purpose, in a case of this kind, to provide against the end, without providing at the same time against the means of accomplishing it."

So also Blackstone defines smuggling to be "the offence of importing goods without paying the duties imposed thereon by the laws of the customs and excise" (4 Black. Com. 154), the words "importing without paying the duties" obviously implying the existence of the obligation to pay the duties at the time the offence is committed, and which duty to pay is evaded by the commission of the guilty act.

A reference to the English statutes sustains the statement

of the text writers above quoted, that the words "smuggling" and "clandestine introduction," so far at least as respected the introduction of dutiable goods from without the kingdom, signified the bringing of the goods on land, without authority of law, in order to evade the payment of duty, thus illegally crossing the line of the customs authorities. Thus, in 1660, by statute 12 Car. II, c. 4, sec. 3, dutiable goods were to be forfeited if brought into any port, etc., of the kingdom and "unshipped to be laid on land" without payment of duties, etc. So, in 1710, by statute 8 Anne, c. 7, sec. 17, dutiable goods "unshipped with intention to be laid on land" without the payment of duties, etc., were to be forfeited, treble the value of the goods was to be forfeited by those concerned in such unshipping, and the vessels and boats made use of "for landing" were also to be forfeited. In 1718, by statute 5 Geo. I, c. 11, entitled "An act against clandestine running of uncustomed goods, and for the more effectual preventing of frauds relating to the customs," provision was made in the fourth section for the seizure and forfeiture of goods concealed in ships from foreign parts "in order to their being landed without payment of duties;" and in section 8 ships of a certain burthen, laden with customable and prohibited goods, hovering on the coasts "with intention to run the same privately on shore," might be boarded, and security exacted against a violation of the laws. In 1721, by statute 8 Geo. I, c. 18, a forfeiture of twenty pounds was imposed upon those receiving or buying any goods, etc., "clandestinely run or imported," before legal condemnation thereof, knowing the goods to have been clandestinely run or imported into the kingdom; while in 1736, by statute 9 Geo. II, c. 35, sec. 21, watermen, etc., employed in carrying goods, "prohibited, run, or clandestinely imported," and found in possession of the same, were to forfeit treble the value of the same; and by section 23 of the same statute penalties were provided to remedy the evil recited in the preamble of unshipping goods at sea, without the limits of any port, "with intent to be fraudulently landed in this kingdom." In 1786, by statute 26 Geo. III, c. 40, sec. 15, bond was required to be given by the master and mate of a

vessel before clearing the vessel for foreign parts, not "to land illegally any goods, or take on board any goods with that intent." In 1762, by statute 3 Geo. III, c. 22, the object of the statute, as recited in the title, was, among other things, "for the prevention of the clandestine running of goods into any part of his majesty's dominions;" while the preamble of the first section recited the advisability of increasing the share of customs and excise officers in forfeited goods so that they should have "equal encouragement to be vigilant in the exertion of their duty, to suppress the pernicious practice of smuggling;" and in the fourth section, "for the more effectual prevention of the infamous practice of smuggling," provision was made looking to the proper distribution among the officers and seamen of public vessels and ships of war of the moiety allowed of the proceeds of goods, etc., seized and condemned.

The statutes just referred to and cognate statutes make it clear, as said above in the passage cited from Bacon's Abridgment, although they contained no express penalty for smuggling *eo nomine*, that the aim was to prevent smuggling, and that to accomplish this result every conceivable act which might lead up to the smuggling of dutiable goods, that is, their actual passage through the lines of the custom house without paying the duty, and every possible act which could follow the unlawful landing, was legislated against, and each prohibited act made a distinct and separate offence, entailing in some cases forfeiture of goods and in others pecuniary penalties and criminal punishments, the forfeitures and punishments varying in nature and extent according as it was deemed that the particular offence to which they were applied was of minor or a heinous character, (such as armed resistance to customs officers,) or was calculated to bring about the successful smuggling of the goods, and so defraud the revenue and cause injury to honest traders. Hence it is, that although the statute law of England made it clear that smuggling was the clandestine landing of the goods within the kingdom in violation of law, Parliament sought to prevent its commission, not by the specific punishment of smuggling, but by legislation

aimed at all acts which could precede or follow the consummation of the unlawful landing of the goods. In other words, the statutes establish not only what was meant by smuggling, but, to use the language of Bacon, also make it certain that provision against the "end," smuggling, was made by the enactment of numerous distinct and separate offences "against the means of accomplishing it."

This theory upon which the English law rested is indicated by a statute enacted in 1558, 1 Eliz. c. 11. The statute contained twelve sections, and provided specific and distinct penalties for various acts tending to lead up to the carrying from English soil of goods prohibited to be exported, and the introduction by clandestine landing of goods prohibited to be imported or of customable goods without the payment of duties thereon. Numerous provisions of the same nature are contained in a statute, consisting of thirty-eight sections, enacted in 1662, 13 and 14 Car. II, c. 11. Other statutes may be found referred to in 6 Geo. IV, (1825,) c. 105, which specifically and separately refers to 442 statutes, and repeals so much and such parts thereof "as relate to the trade and navigation of this kingdom, or to the importation and exportation of goods, wares and merchandise, or as relate to the collection of the revenue of customs or prevention of smuggling."

The distinction between smuggling — the ultimate result — and the various means by which it might be accomplished or by which its accomplishment could be made beneficial, is aptly shown by the recital of a statute enacted in 1736, 9 Geo. II, c. 35, by which all penalties and forfeitures were remitted which had before a date named in the act been incurred "in, by, or for the clandestine running, landing, unshipping, concealing or receiving any prohibited goods, wares, or merchandise, or any foreign goods liable to the payment of the duties of customs and excise, or either of them, and who are or may be subject to any information or other prosecution whatsoever for the duties of such goods, or for the penalties for the running, landing, unshipping, concealing or receiving thereof," as also for many other offences specifically enumerated which had been enacted with the object of preventing the illegal

exportation of goods or the importation of prohibited goods or the illegal landing of customable goods. And it is highly suggestive to observe that the modern English statutes serve but to make clear the purport of the English revenue laws from the beginning concerning the smuggling of dutiable goods. By the statute of 1876 to consolidate the customs laws, 39 and 40 Vict. c. 36, in a subdivision headed, "As to the restrictions on small craft and the regulations for the prevention of smuggling," it was made a specific offence, by section 186, to "import or bring, or be concerned in importing or bringing into the United Kingdom any prohibited goods, or any goods the importation of which is restricted, contrary to such prohibition or restriction, *whether the same be unshipped or not.*" While the bringing of dutiable goods within the jurisdiction of Great Britain, that is, into the waters of the kingdom, with an intent to smuggle or clandestinely introduce the same was not declared to be punishable, in the same section, immediately following the quoted clause, it was made an offence to "unship, or assist or be otherwise concerned in the unshipping of . . . any goods liable to duty, the duties for which have not been paid or secured." In other words, this statute demonstrates that where goods might by law be introduced into the kingdom on paying duties, a violation of the obligation to pay the duties was not committed by the mere entry of the vessel into the waters of the kingdom before the period for the payment or securing the payment of the duties had arisen.

A review of the principal statutes enacted in this country regulating the collection of customs duties establishes that so far as they embraced legislation designed to prevent the evasion of duties they proceeded upon the theory of the English law on the same subject, that is, that they forbade all the acts which were deemed by the lawmaker means to the end of smuggling or clandestinely introducing dutiable goods into the country in violation of law, and which were likewise considered as efficient to enable the offender to reap the expected benefits of his wrongful acts. Therefore, they forbade and prescribed penalties for everything which could precede

smuggling or follow it, without specifically making a distinct and separate offence designated smuggling or clandestine introduction.

The act of July 31, 1789, c. 5, 1 Stat. 29, was entitled "An act to regulate the collection of the duties imposed by law on the tonnage of ships or vessels and on goods, wares and merchandises imported into the United States." The act consists of forty sections, and among other things establishes ports of entry and delivery. By section 10 masters of vessels from foreign ports were required to deliver a manifest of the cargo to any officer who should first come on board; by section 11 the master, etc., was required within forty-eight hours after arrival of the vessel within any port of the United States, etc., to make entry, and also make oath to a manifest, and a forfeiture of $500 was imposed for each refusal or neglect; by section 12 goods unladen in open day or without a permit — except in case of urgent necessity — subjected the vessel, if of the value of $400, and the goods to forfeiture, and the master or commander of the vessel "and every other person who shall be aiding or assisting in landing, removing, housing or otherwise securing the same" were to forfeit and pay $400 for each offence, and were disabled for the term of seven years from holding any office of trust or profit under the United States; by section 22 goods fraudulently entered by means of a false invoice were to be forfeited; by section 24 authority was given to customs officials to make search of ships or vessels, dwelling-houses, etc., for dutiable goods suspected to be concealed, which when found were to be forfeited; by section 25 persons concealing or buying goods, wares or merchandise, knowing them to be liable to seizure under the statute, were to "forfeit and pay a sum double the value of the goods so concealed or purchased;" and by section 40 dutiable goods of foreign growth or manufacture brought *into the United States* except by sea and in certain vessels and landed or unladen at any other place than where permitted by the act, were to be forfeited, together with the vessels conveying them; and it was further provided that "all goods, wares and merchandise brought *into the United States* by land con-

trary to this act should be forfeited, together with the car-
riages, horses and oxen that shall be employed in conveying
the same."

The act of August 4, 1790, c. 35, 1 Stat. 145, consists of
seventy-five sections, and repealed the act of 1789, c. 5. The
act was entitled "An act to provide more effectually for the
collection of the duties imposed by law on goods, wares and
merchandise imported into the United States, and on the ton-
nage of ships or vessels." The provisions of the prior act were
substantially reënacted. Further offences were also defined,
some of which only will now be referred to. Thus, by section
10, when imported goods were omitted from or improperly
described in a manifest, the person in command of the vessel
was subjected to a forfeiture of the value of the goods so
omitted; by section 12 a penalty of not to exceed $500 was
declared for the failure on arrival within four leagues of the
coast, etc., to produce upon demand to the proper officer a
manifest and furnish a copy of the same, or to refuse to give
an account of or to make a false statement as to the destina-
tion of the ship or vessel; by section 13 a penalty of $1000
and forfeiture of goods was authorized for unlading goods
before a vessel should come to the proper place for the dis-
charge of her cargo and until the unshipping had been duly
authorized by a proper officer of the customs; by section 14
vessels in which goods were so unladen were subjected to for-
feiture and the master was to forfeit treble the value of the
goods; by section 28 goods requiring to be weighed or gauged
in order to ascertain the duties due thereon, if removed from
the wharf or place upon which landed, without permission, were
subjected to forfeiture; by section 30 inspectors were author-
ized to be kept on board of vessels until they were unladen,
and among other duties specified enjoined upon such inspect-
ors was one that they were not to "suffer any goods, wares
or merchandise to be landed or unladen from such ship or
vessel without a proper permit for that purpose;" by section
66 masters of vessels or others who should take a false oath
were made liable to a fine of $1000 and to be imprisoned for
not exceeding twelve months; and by section 23 manifests

under oath were required to be furnished by vessels bound to a foreign port, and the person in charge of the vessel departing without so clearing was to forfeit $200.

The act of March 2, 1799, c. 22, 1 Stat. 627, was entitled "An act to regulate the collection of duties on imports and tonnage." It consisted of 112 sections, repealed the act of 1790, c. 35, and substantially reënacted the provisions of that act, though amplifying those provisions, particularly by the insertion of forms of manifests, entries, certificates, etc. By section 32 the master in charge of a vessel in which had been brought goods destined for a foreign port was required, before departing from the district in which he first arrived, to give bond "with condition that the said goods, wares or merchandise, or any part thereof, *shall not be landed* within the United States, unless due entry thereof shall have been first made, and the duties thereupon paid, or secured to be paid according to law." In section 46 provision was made for the entry of baggage and mechanical implements, which were exempted from duty, and for the examination of such baggage; the section ending as follows:

"*And provided*, that whenever any article or articles subject to duty, according to the true intent and meaning of this act, shall be found in the baggage of any person arriving within the United States, which shall not, at the time of making entry for such baggage be mentioned to the collector before whom such entry is made by the person making the same, all such articles so found shall be forfeited, and the person in whose baggage they shall be found shall moreover forfeit and pay treble the value of such articles."

This proviso, it may be stated, has ever since remained on the statute books, being now section 2802 of the Revised Statutes.

By sections 49 and 62 of the act of 1799, entry was required to be made and duties paid or secured to be paid before permission to land goods, wares and merchandise should be granted; by section 103, provision was made as to vessels and packages in which certain articles were thereafter to be imported; a violation to entail a forfeiture of the vessel and

goods; by section 105 and succeeding sections authority was given to import goods and merchandise into districts established and to be established on the northern and northwestern boundaries of the United States, and on the rivers Ohio and Mississippi, "in vessels or boats of any burthen, and in rafts or carriages of any kind or nature whatsoever;" and like report was to be made, like manifests furnished, and entry made as in the case of goods imported into the United States in vessels from the sea, and except as specially provided in the act such importations were to be subject to like regulations, penalties and forfeitures as in other districts.

The requirements as to the production of invoices upon entry of goods subject to an *ad valorem* duty were supplemented by acts of April 20, 1818, c. 79, 3 Stat. 433, and March 1, 1823, c. 21, 3 Stat. 729, which later statute was enacted to take the place of the former, then about to expire by limitation. Original invoices were required to be furnished as a prerequisite to an entry; specific provisions were enacted as to the manner of making entry; in the case of non-residents invoices were required to be verified by the oath of the owner, unless such requirement was dispensed with by the Secretary of the Treasury; and the appointment of appraisers was provided for and the procedure by which the true value of goods was to be determined set forth; and a number of offences relating to the subject declared.

When the act of 1842, heretofore referred to, was enacted, the provisions of the act of 1799, as amended or supplemented by the act of 1823, were, in the main, in force, as they still are.

As we have seen, it was not until 1842 that a specific penalty for smuggling or clandestine introduction, *eo nomine*, was enacted. When the significance of the word "smuggling," as understood at common law, is borne in mind, and the history of the English legislation is considered and the development of our own is brought into view, it becomes manifest that the statute of 1842 was not intended to make smuggling embrace each or all of the acts theretofore prohibited which could precede or which might follow smug-

gling, and which had been legislated against by the imposition of varying penalties; in other words, that it had not for its purpose to cause the means to become the end, but to supplement the existing provisions against the means leading up to smuggling, or which might render it beneficial, by a substantive and criminal statute separately providing for the punishment of the overt act of passing the goods through the lines of the customs authorities without paying or securing the duties; that is, the statute was intended not to merge into one and the same offence all the many acts which had been previously classified and punished by different penalties, but to legislate against the overt act of smuggling itself. And this view makes clear why it was that the statute of 1842 related not generally to acts which precede smuggling or which might follow it, but to the concrete offence of smuggling alone. That this was the purpose which controlled the enactment of the act is cogently manifested by the use of the words "clandestinely introduce," since they, in the common law, were synonymous with smuggling. Indeed, in the English statutes the word "smuggling" and clandestine importation, clandestine running and landing, were constantly made use of, one for the other, as purely convertible terms, all relating to the actual passing of the goods across the line where the obligation to pay the duty existed, and which passing could not be accomplished except in defiance of the duty which the law imposed. The inference that the common law meaning of the word "smuggling" is to be implied, is cogently augmented by the fact that the statute also uses in connection with it words generally known in the law of England as a paraphrase for smuggling. In reason this is tantamount to an express adoption of the common law signification. Moreover, this view is fortified by the concluding portion of the statute which supplements the smuggling or clandestine introduction, by imposing a similar penalty upon every person who "shall make out or pass, or attempt to pass, through the custom house, any false, forged or fraudulent invoice;" all of which were acts connected with the actual entry of the goods, which, if the object intended to be accomplished was effected, would

result in the successful introduction of the goods into the country, without payment, in part at least, of the duties required by law. This relation of the act of 1842 to the then existing legislation and the remedy intended to be accomplished thereby were referred to and elucidated by the court in *United States* v. *Sixty-seven Packages of Dry Goods,* 17 How. 85. In that case, after observing that the provision making criminal the passing or attempting to pass goods through the custom house by means of false, forged or fraudulent invoices (now a part of section 2865) was manifestly directed against the production and use of simulated invoices and those fraudulently made up for the purpose of imposing upon the officers in making the entry, the court said (p. 93) :

"The whole scope of the section confirms this view. It first makes the smuggling of dutiable goods into the country a misdemeanor; and, secondly, the passing or attempt to pass them through the custom house, with intent to defraud the revenue, by means of false, forged or fraudulent invoices ; the latter is an offence which, in effect and result, is very much akin to that of smuggling, except done under color of conformity to the law and regulations of the customs."

It was then, therefore, in effect declared that the smuggling or clandestine introduction of dutiable goods into the United States with intent to defraud the revenue of the United States, against which the act of 1842 provided, was an act committed by passing the goods in defiance of and without conformity to the laws and regulations of the customs, or by preparing, attempting or actually passing the same through the custom house by means of false or fraudulent invoices.

The fact that the smuggling or clandestine introduction into the United States referred to in the act of 1842 had substantially the foregoing significance, is also shown by the case of *United States* v. *Jordan,* 2 Lowell, 537, (1876,) where Lowell, J., in considering the act of 1842 and other statutes, said :

"Under these statutes, smuggling, or bringing in, or introducing goods, has been held by both the Circuit and District Courts for this district for a long course of years to be proved by evidence of the secret landing of goods, without paying or

securing the duties, which, according to the argument here, would be quite inadmissible, if the importation in the sense contended for had no element of concealment about it. I have never known a case of smuggling in which any concealment on board the vessel was relied on by the Government. The gist of the offence is the evasion or attempted evasion of the duties, and they, to be sure, are due when the vessel arrives; but they are not payable until some time after, and it is the default in paying which is the fraud, or in omitting the acts which immediately precede the payment. . . . A bringing on shore without making entry, etc., is part of the importation or introduction of the goods, and makes it illegal."

It was earnestly contended in the argument at bar that the successful administration of the revenue laws would be frustrated unless the pains and penalties of smuggling be held to be applicable to all unlawful acts antecedent to the actual introduction of the goods into the United States. But this argument amounts only to the contention that by an act of judicial legislation the penalties for smuggling should be made applicable to a vast number of unlawful acts not brought within the same by the lawmaking power. And the result would be to control all acts done in violation of the revenue laws by a highly penal criminal statute, although the law has classified them into many distinct offences according to their gravity and imposed different penalties in one case than in others.

The contention that because the portion of the act of 1842, now found in section 2865, was omitted in the revision, and was only reënacted in 1877, therefore its language should be given a wider meaning than was conveyed by the same words when used in the act of 1842, is without merit. When the reënactment took place the act of 1842 in the particular in question had been considered by this court and had been enforced in the lower courts as having a specific purpose and meaning. The reënactment without change of phraseology, by implication, carried the previous interpretation and practice with it. Indeed, the reënactment of the provisions of the act of 1842 is the best indication of the judgment of Congress that the

portion of the statute restored should not have been dropped in the revision, and that its meaning should stand as though it had never been so omitted, but had always continued to exist.

It is settled that the rate of customs duty to be assessed is fixed by the date of importation and is not to be determined by the time when entry of the merchandise is made. But this throws no light on the meaning of the word "smuggling," since that word, both at common law and under the text of the acts of Congress, is an act by which the goods are introduced without paying or securing the payment of the duties, and hence concerns, not the mere assessment of duty, but the evasion of a duty already assessed, by passing the line of the customs authorities in defiance of law.

There remains only one further contention for consideration, that is, the assertion that, whatever may have been the meaning of the term "smuggling" at common law and its significance at the time when the statute of 1842 was adopted, that word as now found in section 2865 of the Revised Statutes is to have a more far-reaching significance, because it must be interpreted by the meaning affixed to the word in section 4 of the anti-moiety act of June 22, 1874, c. 391, 18 Stat. 186. The section relied on is as follows:

"SEC. 4. That whenever any officer of the customs or other persons shall detect and seize goods, wares or merchandise, in the act of being smuggled, or which have been smuggled, he shall be entitled to such compensation therefor as the Secretary of the Treasury shall award, not exceeding in amount one half of the net proceeds, if any, resulting from such seizure, after deducting all duties, costs and charges connected therewith : *Provided,* That for the purposes of this act smuggling shall be construed to mean the act, with intent to defraud, of bringing into the United States, or, with like intent, attempting to bring into the United States, dutiable articles without passing the same, or the package containing the same, through the custom house, or submitting them to the officers of the revenue for examination." . . .

It suffices to say in answer to this contention that if the

anti-moiety act had the meaning claimed for it, by the very terms of that act such meaning was restricted to "the purposes" of that act alone. That statute had in view the reward to be reaped by informers under the revenue laws of the United States, and the words, "for the purposes of this act," can in reason only be construed as contemplating a more enlarged construction of the word "smuggling," for the purpose of stimulating efforts at detecting offenders against the revenue laws, and cannot be held applicable, in the absence of the clearest expression by Congress of a contrary intent, to a different and criminal statute. Indeed, if the word "smuggling" in the act of 1842 embraced, as asserted, every unlawful act which might lead up to smuggling, then the explanatory words found in the anti-moiety act would be wholly superfluous. Their insertion in the statute was evidently, therefore, a recognition of the fact that smuggling had at the time of the passage of the anti-moiety act a defined legal and restricted significance, which it was the intent of Congress to enlarge for a particular purpose only, and which enlargement would be absolutely without significance if the term before such enlargement had meant exactly what Congress took pains to state it intended the word should be construed, as meaning for the exceptional purposes for which it was legislating.

Examining the case made by the record, in the light of the foregoing conclusions, it results that, whether we consider the testimony of the captain alone or all the testimony contained in the record, as it unquestionably establishes that there was no passage of the packages of diamonds through the lines of the customs authorities, but that on the contrary the package was delivered to the customs officer on board the vessel itself, at a time when or before the obligation to make entry and pay the duties arose, that the offence of smuggling was not committed within the meaning of the statute, and therefore that the court erred in instructing the jury that if they believed the testimony of the captain they should convict the defendant and in refusing the requested instruction that the jury upon the whole testimony should return a verdict for

the defendant.  This conclusion renders unnecessary a con-
sideration of the other questions of alleged error discussed in
the argument at bar.

> *The judgment must therefore be reversed and the case re-
> manded with directions to set aside the verdict and grant
> a new trial.*

MR. JUSTICE BROWN, with whom were the CHIEF JUSTICE,
MR. JUSTICE HARLAN and MR. JUSTICE BREWER, dissenting.

I find myself unable to concur in the opinion of the court in
this case, and particularly in a definition of smuggling, which
requires that the goods shall be actually unladen and carried
upon shore.

This definition rests only upon the authority of Hawkins'
Pleas of the Crown, (A.D. 1716,) repeated in Bacon's Abridg-
ment, (A.D. 1736,) and copied into Russell on Crimes, (A.D. 1819,)
and Gabbet's Criminal Law, a work but little known.  The
diligence of counsel has failed to find support for it in a single
adjudicated case in England or this country.  If it were ever
the law in England, it never found a lodgement in its standard
dictionaries, either general or legal, and has never been recog-
nized as such by writers upon criminal law, with the excep-
tions above stated.  It was never treated as the law in Amer-
ica.  The truth seems to be that smuggling *eo nomine* was
formerly, whatever it may be now, not a crime in England,
but a large number of acts leading up to an unlawful unlading
of goods were made criminal.  Smuggling appears to have
been rather a popular than a legal term, and the fact that it
was usually accompanied by the landing of goods on shore
may have led to the definition made use of by Bacon and
Hawkins.  Indeed, in all the old English statutes cited in the
opinion of the court it is recognized that the ultimate object
of all smugglers is to get their goods ashore without payment
of duties.

If, as stated by these authors, the actual unlading and car-
riage of the goods to the shore were an essential ingredient of
the offence, it is somewhat singular that it should have escaped

the notice of so learned a writer as Sir William Blackstone, who defines it in accordance with the views of the other writers upon the subject as " the offence of importing goods without paying the duties imposed thereon by the laws of the customs and excise." 4 Bl. Com. 154. Dr. Johnson, with his customary disregard of conventionalities, defines the verb " to smuggle" as " to import or export goods without paying the customs," and a smuggler as " a wretch who, in defiance of justice and the laws, imports or exports goods, either contraband or without paying the customs." In Burns' Law Dictionary, (1792,) smugglers are said to be " those who conceal prohibited goods and defraud the King of his customs on the seacoast by running of goods and merchandise." In Brown's Law Dictionary, (Eng. 1874,) smuggling is defined as " importing goods which are liable to duty so as to evade payment of duty;" and in McClain's Criminal Law, (sec. 1351,) as importing dutiable goods without payment. There are similar definitions in the Encyclopædia and also in the Imperial Dictionary. In the Encyclopædia Britannica " smuggling" is said to denote " a breach of the revenue laws, either by the importation or the exportation of prohibited goods, or by the evasion of customs duties on goods liable to duty;" and Stephen, in his Summary of the Criminal Law, p. 89, defines smuggling as the " importing or exporting of goods without paying the duties imposed thereon by the laws of customs and excise, or of which the importation or exportation is prohibited." Similar definitions are given by Lord Hume in his Commentaries on the Laws of Scotland, as well as in Bell's Dictionary of Scottish Law, p. 225. In Tomlin's Law Dictionary, where smuggling is defined as " the offence of importing or exporting goods without paying the duties imposed thereon by the custom or excise laws," a list of some thirty or forty acts connected with the unlawful and fraudulent importation of goods is given, but in none of them is the word " smuggle" mentioned as an offence. In the sixth edition of his work on Crimes, Sir William Russell gives as his authority for the definition Hawkins, Bacon and Blackstone, the last of whom is against him, and also sets forth a large number of acts " for the prevention of

smuggling," passed during the present reign, none of which mention the word "smuggle" as a distinct crime. Indeed, the word seems to be a popular summing up of a large number of offences connected with the clandestine introduction of goods from foreign ports.

But conceding all that is claimed as to the law of England in that particular, the question is not what was the law of England during the last century, nor what it is to-day, but what was the law of the United States in 1842 when this act was passed, and in 1877 when it was incorporated in the Revised Statutes? If we are to rely for a definition upon our lexicographers and legal grammarians, there can be no doubt upon the subject, as by Webster, Worcester, the Century and the Standard Dictionaries, and in all the law lexicons, the offence is defined in somewhat varied phraseology as the clandestine importation of goods without the payment of duties. I know of no American authority, except the dictum of Judge Lowell in *United States* v. *Jordan*, 2 Lowell, 537, to the contrary.

It would seem from that case and from certain expressions in the opinion of the court in the case under consideration, that the offence is not complete even when the goods are unladen and put upon the shore, and that a failure to pay duty upon them is a necessary element to justify an indictment, or that, as the words "without paying or accounting for the duty," imply the existence of the obligation to pay or account at the time of the commission of the offence, which duty is evaded by the guilty act, it follows that the offence is not committed by an act done before the obligation to pay or account for the duties arises, although such act may indicate a future purpose to evade when the period of paying or securing the payment of duties has been reached. It follows from this that if, as is the custom upon the arrival of trans-Atlantic steamers, a passenger's baggage is landed upon the wharf, and the trunks are filled with goods clandestinely imported, the owner cannot be convicted of smuggling them under this statute, since the obligation to pay the duties upon them does not arise until an attempt is made to carry them off the wharf.

In my view the act of smuggling is complete when the goods are brought within the waters of a certain port, with intent to land them without payment of duties. Whether, if the duties be subsequently paid, such payment would be a condonation of the offence is a question upon which it is unnecessary to express an opinion. It might depend upon the motives which induce the importer to pay the duties. If they were paid after detection, it might not be considered sufficient; if before detection it would be strong evidence of a change of purpose. If the testimony of the captain in this case is to be believed, he brought the package of diamonds into port wholly ignorant of the fact that it contained dutiable articles. Defendant himself was not on board the steamer, but took passage on another ship to arrive later at another port, thus putting it out of his power to pay or account for the duty. The guilty intent with which the package was delivered in Antwerp to an innocent party for transportation to this country must be held to have continued, since defendant had deliberately deprived himself of any *locus penitentiæ* by handing the package to the captain for transportation and delivery.

But we think it is unnecessary to look beyond the language of the statute itself to determine what is meant by the word "smuggle," since it is there defined as the clandestine introduction into the United States of "any goods, wares or merchandise subject to duty by law, and which should have been invoiced, without paying or accounting for the duty." If the words "clandestinely introduce" are not intended as a definition of the prior word "smuggle," they are intended as a separate offence, and in either case the defendant would be liable if he clandestinely introduced the goods without paying or accounting for the duty thereon. What then is meant by a clandestine introduction? In at least two cases in this court, *United States* v. *Vowell*, 5 Cranch, 368; *Arnold* v. *United States*, 9 Cranch, 104, an "importation" to which the government's right to duty attaches was defined to be an arrival within the limits of some port of entry. Or, as stated by Mr. Justice Curtis in *United States* v. *Ten Thousand Cigars*, 2 Curtis, 436, "an importation is complete when the goods are

brought within the limits of a port of entry with the intention of unlading them there." A similar definition of an importation is given in the following cases: *Harrison* v. *Vose*, 9 How. 372, 381; *United States* v. *Lyman*, 1 Mason, 499; *McLean* v. *Hager*, 31 Fed. Rep. 602, 606; *The Schooner Mary*, 1 Gallison, 206, wherein it was said by Mr. Justice Story that "an importation is a voluntary arrival within some port with intent to unlade the cargo."

Such being the meaning of the word "import," a clandestine importation would be the bringing of goods into a port of entry with design to evade the duties. Should a narrower meaning be given to the words "clandestinely introduce"? I think not. The word "introduce" would strike me as entitled to an even broader meaning than the word "import." To introduce goods into the United States is to fetch them within the jurisdiction of the United States, or at least within some port of entry, and the requirement that they should be unladen or brought on shore is to import a feature which the ordinary use of language and the object of the act does not demand. If the construction of the words "clandestinely introduce" adopted by the court be the correct one, it would follow that a vessel loaded with goods, which the owner designed to import without payment of duty, leaving a European port, might be navigated up the St. Lawrence and through the chain of Great Lakes to Chicago, (a voyage by no means unknown,) or up the Mississippi to St. Louis, and be moored to a dock, and yet the goods be not introduced into the United States, because not actually unladen upon the wharf. I cannot give my consent to such a narrow definition.

Confirmation of the above meaning of the word "smuggle" may, I think, be found in the act of June 22, 1874, c. 391, 18 Stat. 186, commonly known as the "anti-moiety act." In section 4 of that act it is provided that the Secretary of the Treasury shall award to officers or others detecting or seizing smuggled goods a proportion of their proceeds, and that "for the purposes of this act smuggling shall be construed to mean the act with intent to defraud or bringing into the United States, or with like intent attempting to bring into the United

States, dutiable goods without passing the same, or the package containing the same, through the custom house, or submitting them to the officers of the revenue for examination." It is true the definition is given "for the purposes of this act," and evidently with the object of including within its provisions not only the act of smuggling proper, that is, the act of importing with intent to defraud dutiable articles without passing, etc., but of an *attempt* to do the same, which would probably not be construed as smuggling under the provisions of other acts. It is scarcely possible that Congress should have contemplated wholly different interpretations of the same words in different acts.

But it is useless to prolong this discussion. The whole question turns upon the meaning of the words "smuggle" and "clandestinely introduce." I have given my reasons for believing that they include an importation of goods with an intent to evade the duties — the right to which has already attached — and I am at a loss to understand why an obsolete definition of the English law should be rehabilitated to defeat the manifest intention of Congress.