5 F.2d 838 (1925)
THE OVER THE TOP.
SCHROEDER
v.
BISSELL, Collector.
Admiralty Nos. 2796-2798; Equity No. 1746.
District Court, D. Connecticut.
February 26, 1925.
*839 John Buckley, U. S. Atty., and George H. Cohen, Asst. U. S. Atty., both of Hartford, Conn., for the United States.
Louis Halle, of New York City, for cargo.
John E. Macy, of Boston, Mass., for owner of schooner.
THOMAS, District Judge.
On November 7, 1924, Schroeder, the owner of the cargo, brought an application against the collector of customs for the Port of Connecticut to show cause why the cargo of liquor should not be returned to him. This application was returnable November 11, 1924. This proceeding was entered on the docket and is known as equity No. 1746. Following this rule to show cause and on November 12, 1924, the United States filed a libel of forfeiture against the schooner itself, and this proceeding is entered on the docket as No. 2797, in admiralty. On the same day, the government filed two libels against the cargo, and those cases are entered on the docket and known as No. 2796 and No. 2798, in admiralty. The trial on the issues raised by the libels and respective answers was had on January 16, 1925, and as these cases were tried together, they will all be discussed and decided in one opinion.
From the evidence I find the following facts established: On August 27, 1924, the schooner Over the Top, carrying a cargo of whisky and operating under the British flag and under British registry, cleared for Cuba from St. Johns, New Brunswick. It arrived at a point off the coast of Block Island several weeks prior to October 19, 1924. The schooner was chartered by one A. L. Schroeder, the owner of the cargo, who operates in Montreal but whose residence or citizenship is undisclosed.
On the 19th of October, 1924, at about 10 o'clock in the evening, the supercargo on board the schooner sold 25 cases of whisky for $550 to a special agent of the Internal Revenue Department. The sale was made in the presence of the captain, and thereupon the crew of the vessel, in the presence and under the direction of the captain, unloaded these cases of whisky and transferred the same to a sea sled employed in the government service. Both captain and supercargo knew that the whisky so transferred was to be transported to a point on the adjacent coast, but neither one of them knew that the sea sled or the men on it were in the government service. The transaction occurred at a point approximately 19 miles distant from the shore, or 115 degrees true from the southeast light of Block Island, and within one hour's running distance as computed by the possible speed of the sea sled when running empty and in the daytime. The sea sled thereupon proceeded to the United States coast guard cutter Tampa, and 23 of the cases were unloaded on board the Tampa, and the other two cases were landed at New London.
On the following day, Over the Top was seized by officers of the United States coast guard, and the captain and crew were placed under arrest, and the ship and her cargo were towed into the Port of New London and turned over to the collector of customs and are now in his custody.
I further find that the schooner had been hovering for some time off the coast of the United States at the point where she was seized, and that those in command were engaged during that period in selling liquor and delivering the same to boats proceeding from the coast of the United States and returning thereto. The testimony seems to support the conclusion that business was slow.
Upon these facts, the United States demands judgment decreeing the forfeiture and sale of the ship and cargo. The owner of the ship and the owner of the cargo have appeared separately, but the trial of *840 the three actions was consolidated, and, as will be seen in the sequel, the principles of law governing are applicable alike to both the schooner and cargo.
The government bases its claim of forfeiture upon the alleged violation of sections 447, 448, 450, 453, 585, 586, 593, and 594 of the Tariff Act of 1922 (Comp. St. Ann. Supp. 1923, §§ 5841e16, 5841e17, 5841e19, 5841e22, 5841h4, 5841h5, 5841h12-5841h14), as well as upon the provisions of the American-British Treaty which became effective May 22, 1924. The above sections of the Tariff Act provide as follows:
"Sec. 447. Unlading  Place.  It shall be unlawful to make entry of any vessel or to unlade the cargo or any part thereof of any vessel elsewhere than at a port of entry: Provided, that upon good cause therefor being shown, the Secretary of Commerce may permit entry of any vessel to be made at a place other than a port of entry designated by him, under such conditions as he shall prescribe: And provided further, that any vessel laden with merchandise in bulk may proceed after entry of such vessel to any place designated by the Secretary of the Treasury for the purpose of unlading such cargo, under the supervision of customs officers if the collector shall consider the same necessary, and in such case the compensation and expenses of such officers shall be reimbursed to the government by the party in interest.
"Sec. 448. Same  Preliminary Entry  Permit.  Except as provided in section 441 of this act, no merchandise, passengers, or baggage shall be unladen from any vessel or vehicle arriving from a foreign port or place until entry of such vessel or report of the arrival of such vehicle has been made and a permit for the unlading of the same issued by the collector: Provided, that the master may make a preliminary entry of a vessel by making oath or affirmation to the truth of the statements contained in the vessel's manifest and delivering the manifest to the customs officer who boards such vessel, but the making of such preliminary entry shall not excuse the master from making formal entry of his vessel at the custom house, as provided by this act. After the entry, preliminary or otherwise, of any vessel or report of the arrival of any vehicle, the collector may issue a permit to the master of the vessel, or to the person in charge of the vehicle, to unlade merchandise or baggage, but merchandise or baggage so unladen shall be retained at the place of unlading until entry therefor is made and a permit for its delivery granted, and the owners of the vessel or vehicle from which any imported merchandise is unladen prior to entry of such merchandise shall be liable for the payment of the duties accruing on any part thereof that may be removed from the place of unlading without a permit therefor having been issued. Any merchandise or baggage so unladen from any vessel or vehicle for which entry is not made within forty-eight hours exclusive of Sunday and holidays from the time of the entry of the vessel or report of the vehicle, unless a longer time is granted by the collector, as provided in section 484, shall be sent to the public stores and held as unclaimed at the risk and expense of the consignee in the case of merchandise and of the owner in the case of baggage, until entry thereof is made."
"Sec. 450. Same  Sundays and Holidays.  No merchandise, baggage, or passengers arriving in the United States from any foreign port or place, and no bonded merchandise or baggage being transported from one port to another, shall be unladen from the carrying vessel or vehicle on Sunday, a holiday, or at night, except under special license granted by the collector under such regulations as the Secretary of the Treasury may prescribe."
"Sec. 453. Penalty for Violation.  If any merchandise or baggage is laden on, or unladen from, any vessel, or vehicle without a special license or permit therefor issued by the collector, the master of such vessel or the person in charge of such vehicle and every other person who knowingly is concerned, or who aids therein, or in removing or otherwise securing such merchandise or baggage, shall each be liable to a penalty equal to the value of the merchandise or baggage so laden or unladen, and such merchandise or baggage shall be subject to forfeiture, and if the value thereof is $500 or more, the vessel or vehicle on or from which the same shall be laden or unladen shall be subject to forfeiture."
"Sec. 585. Departure Before Report or Entry.  If any vessel or vehicle from a foreign port or place arrives within the limits of any collection district and departs or attempts to depart, except from stress of weather or other necessity, without making a report or entry under the Provisions of this Act, or if any merchandise is unladen therefrom before such report or entry, the master of such vessel shall be liable to a penalty of $5,000, and the person in charge of such vehicle shall be liable to a penalty of $500, and any such vessel or vehicle shall be *841 subject to forfeiture, and any customs or coast guard officer may cause such vessel or vehicle to be arrested and brought back to the most convenient port of the United States.
"Sec. 586. Unlawful Unlading  Exception.  The master of any vessel from a foreign port or place who allows any merchandise (including sea stores) to be unladen from such vessel at any time after its arrival within four leagues of the coast of the United States and before such vessel has come to the proper place for the discharge of such merchandise, and before he has received a permit to unlade, shall be liable to a penalty equal to twice the value of the merchandise but not less than $1,000, and such vessel and the merchandise shall be subject to seizure and forfeiture: Provided, that whenever any part of the cargo or stores of a vessel has been unladen or transshipped because of accident, stress of weather, or other necessity, the master of such vessel shall, as soon as possible thereafter, notify the collector of the district within which such unlading or transshipment has occurred, or the collector within the district at which such vessel shall first arrive thereafter, and shall furnish proof that such unlading or transshipment was made necessary by accident, stress of weather, or other unavoidable cause, and if the collector is satisfied that the unlading or transshipment was in fact due to accident, stress of weather, or other necessity the penalties above described shall not be incurred."
"Sec. 593. Smuggling and Clandestine Importations.  (a) If any person knowingly and willfully, with intent to defraud the revenue of the United States, smuggles, or clandestinely introduces, into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the custom house any false, forged, or fraudulent invoice, every such person, his, her, or their aidors and abettors, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in any sum not exceeding $5,000, or imprisoned for any term of time not exceeding two years, or both, at the discretion of the court.
"(b) If any person fraudulently or knowingly imports or brings into the United States, or assists in so doing, any merchandise, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law, such merchandise shall be forfeited and the offender shall be fined in any sum not exceeding $5,000 nor less than $50, or be imprisoned for any time not exceeding two years, or both. Whenever, on trial for a violation of this section, the defendant is shown to have or to have had possession of such goods, such possession shall be deemed evidence sufficient to authorize conviction, unless the defendant shall explain the possession to the satisfaction of the jury.
"Sec. 594. Seizure of Vessels and Vehicles.  Whenever a vessel or vehicle, or the owner or master, conductor, driver, or other person in charge thereof, has become subject to a penalty for violation of the customs revenue laws of the United States, such vessel or vehicle shall be held for the payment of such penalty and may be seized and proceeded against summarily by libel to recover the same: Provided, that no vessel or vehicle used by any person as a common carrier in the transaction of business as such common carrier shall be so held or subject to seizure or forfeiture under the customs laws, unless it shall appear that the owner or master of such vessel or the conductor, driver, or other person in charge of such vehicle was at the time of the alleged illegal act a consenting party or privy thereto."
So much of the Treaty as is necessary for consideration is as follows:

"Article I.
"The high contracting parties declare that it is their firm intention to uphold the principle that 3 marine miles extending from the coastline outwards and measured from low-water mark constitute the proper limits of territorial waters."

"Article II, Sections 1, 2, and 3.
"(1) His Britannic Majesty agrees that he will raise no objection to the boarding of private vessels under the British flag outside the limits of territorial waters by the authorities of the United States, its territories or possessions in order that enquiries may be addressed to those on board and an examination be made of the ship's papers for the purpose of ascertaining whether the vessel or those on board are endeavoring to import or have imported alcoholic beverages into the United States, its territories or possessions in violation of the laws there in force. When such enquiries and examination show a reasonable ground for suspicion, a search of the vessel may be instituted.
"(2) If there is reasonable cause for belief *842 that the vessel has committed or is committing or attempting to commit an offense against the laws of the United States, its territories or possessions prohibiting the importation of alcoholic beverages, the vessel may be seized and taken into a port of the United States, its territories or possessions for adjudication in accordance with such laws.
"(3) The rights conferred by this article shall not be exercised at a greater distance from the coast of the United States, its territories, or possessions than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense. In cases, however, in which the liquor is intended to be conveyed to the United States, its territories or possessions by a vessel other than the one boarded and searched, it shall be the speed of such other vessel and not the speed of the vessel boarded, which shall determine the distance from the coast at which the right under this article can be exercised."
But before we proceed to discuss the above-quoted sections of the Tariff Act as well as the treaty, it may be well to dispose of one of the contentions made by counsel in behalf of the cargo and the schooner.
The proposition is advanced that, regardless of our municipal legislation, the acts complained of could not constitute offenses against the United States when committed by foreign nationals, on foreign bottoms, on the high seas at a point beyond the territorial jurisdiction of the country. Well-known principles of international practice are invoked in support of this contention accompanied with the citation of authority. Upon careful consideration, however, I am led to conclude that a misconception exists here as to the status, in a federal forum, of so-called international law when that law encounters a municipal enactment.
If we assume for the present that the national legislation has, by its terms, made the acts complained of a crime against the United States even when committed on the high seas by foreign nationals upon a ship of foreign registry, then there is no discretion vested in the federal court, once it obtains jurisdiction, to decline enforcement. International practice is law only in so far as we adopt it, and like all common or statute law it bends to the will of the Congress. It is not the function of courts to annul legislation; it is their duty to interpret and by their judicial decrees to enforce it  and even when an act of Congress is declared invalid, it is only because the basic law is being enforced in that declaration. There is one ground only upon which a federal court may refuse to enforce an act of Congress and that is when the act is held to be unconstitutional. The act may contravene recognized principles of international comity, but that affords no more basis for judicial disregard of it than it does for executive disregard of it. These libels, therefore, cannot be attacked upon the ground that the territorial jurisdiction of the United States cannot be extended beyond the three-mile sea zone under international law.
If, however, the court has no option to refuse the enforcement of legislation in contravention of principles of international law, it does not follow that in construing the terms and provisions of a statute it may not assume that such principles were on the national conscience and that the congressional act did not deliberately intend to infringe them. In other words, unless it unmistakably appears that a congressional act was intended to be in disregard of a principle of international comity, the presumption is that it was intended to be in conformity with it. It is with such a principle in mind that we now proceed to an examination of the legislation upon which the government relies.
Section 447 of the Tariff Act of 1922, quoted supra, makes it unlawful for the vessel to make entry of or to unlade any part of its cargo elsewhere than at a port of entry. Part of the cargo of Over the Top was unloaded on the high seas, and the government contends that the statute was thereby violated. To me it seems that the statute was intended to prevent entry or unlading at a port or place in the country other than a port of entry. It had no reference to unlading on the seas even when done within the three-mile zone. But waiving that question, it is to be noted that the act is phrased in general language and that it bespeaks no suggestion of territorial limitation. The proposition has not heretofore been advanced that for that reason the act has attempted to extend the territorial jurisdiction of the United States over the whole earth. Almost all criminal statutes, or statutes prohibiting defined conduct, are phrased in general language without mention of territorial limitation. But they are all to be read in the light of the principle that jurisdiction is not extraterritorial and that the municipal legislation is not attempting to regulate or to punish conduct performed outside of the national domain. For example, the statutes of Connecticut do not forbid larceny in Connecticut  they forbid larceny. The statutes of the United States do not forbid counterfeiting *843 in the United States  they forbid counterfeiting. That the Congress may, in disregard of the law of nations, prohibit acts by foreign nationals not committed within our domain, has already been conceded; but unless such intent clearly appears from the language of the statute such intent is not to be presumed.
It would seem that the libelant does not take the view that the acts complained of constituted an infraction of our law by the very force of the language of the statute, else there would be no reason to invoke the aid of the provisions of American-British Treaty. It is obvious that if the unlading of the whisky 19 or 20 miles out at sea constituted a violation of section 447 of the Tariff Act, then such violation was justiciable and punishable irrespective of the provisions of the treaty. The treaty would serve to obviate diplomatic embarrassments arising out of the seizure of a British vessel on the high seas, but it would be useless for the purposes of determining the intent of the provisions of section 447 of the Tariff Act.
The same considerations apply with equal force to the provisions of sections 448, 450, 453, 585, 593, and 594 of the Tariff Act of 1922. These enactments of the Congress are implicit with the proviso that the acts therein denounced be accomplished within the territory of the United States. No attempt is there discernible to extend the legislative jurisdiction of the United States beyond its boundaries. Of utmost significance, therefore, is the language of section 586 of the act providing that the master of any vessel from a foreign port, who allows any merchandise to be unladen from such vessel at any time after its arrival within four leagues of the coast of the United States, and before such vessel has come to the proper place for the discharge of such merchandise, and before permission has been given to unlade, shall be liable to a penalty, and the vessel and the merchandise shall be subject to seizure and forfeiture. It appears to me that this section has a most important, if not a determinative, bearing upon the point under discussion. This enactment has been part of our legislation for over a hundred years. Here we have a distinct extension of our sea jurisdiction to a point 12 miles from the coast  an assertion of authority which may perhaps clash with international practice, but which, whether challenged or not, is unmistakable, and which, therefore, it is the business of our courts to enforce. Had the master and super cargo of Over the Top been guilty of unlading the liquor at a point within this 12-mile zone, it may be that we would have had no difficulty in sustaining the libels.
Indeed, the applicability of section 593 of the Tariff Act to the case at bar has already been negatively determined in the authoritative opinion of the Supreme Court in Keck v. United States, 172 U. S. 434, 19 S. Ct. 254, 43 L. Ed. 505. The statute which was the subject of construction in that case was substantially the same in language as section 593 now under consideration, and there it was held that the offense denounced by the statute could not be accomplished until the customs barrier had been passed, and therefore, even though goods intended to be smuggled were brought within the three-mile sea zone, that, nevertheless, smuggling was not perpetrated until the goods were landed and passed into the country.
My conclusion, then, is that as no statute embracing the subject-matter of sections 447, 448, 450, 453, 585, 586, 593, and 594 of the Tariff Act of 1922 has extended our territorial jurisdiction to a point on the high seas distant 19 miles from our coast, conduct which would have been in violation of these sections if performed within our territory cannot constitute an offense against the United States when performed at such a distance by foreign nationals on ships of foreign registry. If, for the purpose of our treasury, we can extend our sea jurisdiction to a point four leagues from the coast, I see no reason why we cannot extend it four leagues more. I merely observe that we have not done so yet.
I now come to the provisions of the American-British Treaty, which was obviously contracted for the purpose of preventing hovering ships from supplying intoxicating liquor to carriers running between the ships and the shore. There can be no question as to the general intent of the treaty and as to what was supposed to have been accomplished by its provisions. But it is one thing to apprehend the purpose of an act and quite another to determine that the language of the act is effective. The treaty in question provides that no objections will be raised by the British government to the boarding of vessels flying the British flag outside the territorial waters of the United States for the purpose of investigating the cargo in order to determine whether the vessel or those on board are endeavoring to import alcoholic beverages into the United States in violation of our laws. The British government further *844 does not object to the seizure of such a vessel found violating our law and to its disposition in accordance with such laws. The treaty further provides that the zone of operations by the United States is extended to a point one hour's running distance from our coast, wholly irrespective of the mileage coverable within such hour, and that where the liquor is intended to be conveyed to the coast by a vessel other than the one boarded and searched it is the speed of that vessel which is to determine the distance.
I have already found that the possible speed of the sea sled under the conditions disclosed by the testimony was about 30 knots an hour. But the evidence showed that this speed was made in the daylight when the boat carried no load, and when it skidded along over the top of the water with its stern only displacing water and while running from New London to Point Judith Gas Buoy and along the lee of the land. There is absolutely no evidence in the record as to how far the sea sled could travel in an hour and in the dark with 25 cases of liquor and three men aboard as on the night it left the schooner Over the Top with wind, weather, and tide as it in fact existed on the night in question.
Now the treaty provides that the right of seizure cannot be exercised at a greater distance from the coast "than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense." As we are dealing here with fines and forfeitures, I cannot assume that this language was intended to cover an hypothetical case; that the seizure would be treated as legal if accomplished at a point constituting the greatest distance which the unladen ship could traverse in one hour at her maximum speed under the most favorable conditions of wind and tide. It seems to me that a rational construction requires us to measure the distance by the actual speed of the boat accomplished from the point of capture to the nearest available point on the coast in normal wind and tide and under the same conditions as pertain at the time of the seizure. Nor can I see any reason for applying any different rule when the distance is to be measured by the speed of the carrier from ship to coast. It is the speed of the boat conveying liquor, and when it is engaged in conveying liquor to the United States, that must be determined. When conveying liquor, her speed may be below that of her speed when empty.
That such jurisdictional facts may be exceedingly difficult of proof, and that penalties and forfeitures are to be determined by a standard as uncertain as the equity which once was said to vary with the size of the chancellor's foot, may be a matter of regret; but it is the business of the courts to construe treaties and not to make them. But it is to be noted in this particular case the sea sled, owned by the government and operated by government officials, had full opportunity to time its run laden with its crew and 25 cases of liquor on the night in question and so present in court reliable and satisfactory evidence. Instead, they turned and made for the Tampa, and on it unloaded 23 cases and carried only 2 cases to New London. And no explanation was offered for such operations.
There being no evidence before me from which I can determine the speed of the sea sled when laden with the 25 cases of liquor, and no evidence to meet the provisions of the treaty that, "In cases, however, in which the liquor is intended to be conveyed to the United States * * * by a vessel other than the one boarded and searched, it shall be the speed of such other vessel, * * * which shall determine the distance from the coast at which the right under this article can be exercised" (article 2, § 3), I would feel obliged for this reason alone to decree a dismissal of the libels. But I am not unmindful of the possibility of error in my construction of this part of the treaty and a much larger question looms in the background.
It must be noted that the treaty does not define the acts constituting an offense against the laws of the United States prohibiting the importation of alcoholic beverages. These acts are defined in the statute. If reasonable grounds exist for believing that a vessel under British registry is in fact guilty of contravening the Prohibition Law (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), then our government may seize it if it is within the specified area, and when seized its fate may then be determined in accordance with our laws. If it is not within the specified area, it may not even be seized. But if it is within the specified area, it does not follow that it is for that reason violating our laws.
Now the grant by one sovereign to another of the right to seize its nationals upon the high seas without process and by force majeure for crimes committed by those nationals against the offended sovereign, by no means declares that those acts when committed on the high seas constitute such crimes. If, before this treaty was contracted, the unlading of merchandise by a ship of British *845 registry at a point more than four leagues removed from the coast of the United States did not constitute a crime against the United States (and there appears to be no contention that it did), then the treaty could not and did not make it a crime.
In support of its contention, the government cites and relies upon United States v. The Pictonian, 3 F. (2d) 145, recently decided in the Eastern district of New York, where it was held that the American-British Treaty did, as to ships of British registry, extend the operation of the criminal laws of the United States to the shifting line designated in the treaty. I have carefully read Judge Campbell's opinion and find myself unable to agree with its reasoning. The learned judge speaks of the treaty as self-executing. The significance of the phrase in this connection is somewhat obscure. As a treaty, there was no need of congressional legislation to make it effective, and in this sense all treaties are self-executing. But if it was the intent of the government to make it a crime for a ship of British registry to unlade liquor within a sea zone on our coast, traversible in one hour, then that intent was not effectuated by the mere execution of the treaty. It is not the function of treaties to enact the fiscal or criminal law of a nation. For this purpose no treaty is self-executing. Congress may be under a duty to enact that which has been agreed upon by treaty, but duty and its performance are two separate and distinct things. Nor is there any doubt that the treaty making power has its limitations. What these are has never been defined, perhaps never need be defined. Certain it is that no part of the criminal law of this country has ever been enacted by treaty.
Illustrations of congressional effectuation of treaties are plentiful. All treaties requiring payments of money have been followed by acts of Congress appropriating the amount. The treaties were the supreme law of the land, but they were ineffective to draw a dollar from the treasury. The Russian-American Treaty of 1824 (8 Stat. 302) against selling liquors to the Alaskan natives was followed by the necessary penal legislation by the Congress. The treaty with various powers made in 1847 defining piracy and declaring its punishment, received similar reinforcing enactments. The same was true of the Treaty of 1862 with Great Britain (12 Stat. 1225), suppressing the slave trade; of the Treaty of 1884 (24 Stat. 989), with various powers imposing fines and penalties for the protection of submarine cables; and of the Treaty of 1912 (37 Stat. 1542), for the protection of seals in the North Pacific Ocean.
The instances just cited indicate the practice of congressional action in order to effectuate the penal provisions of a treaty, and I have no doubt that such practice is necessary in order to accomplish the purposes of the treaties. It happens that the American-British Treaty here under consideration does not declare it a crime for a British national on a ship of British registry to sell liquor for purposes of importation into this country within one hour's running distance of our shore. Nor does the treaty forbid such an act. But even if such conduct had been prohibited by the terms of the treaty, no indictment could lie for transgressing that prohibition. If an indictment could not lie for violating the direct command of the Eighteenth Amendment to the Constitution until the Congress had defined the offense and proclaimed the penalty, then the fiat of a treaty would be inadequate for such a purpose. No distinction exists here between the necessary basis of an indictment and that of a libel for forfeiture. If the facts do not warrant an indictment, they do not warrant a penalty.
In this connection it may be well to emphasize the general nature of the provisions of the Tariff Act relied upon by the libelant. In the instance at bar, we happen to be dealing with liquor, but the legislation which is invoked is by no means concerned exclusively with this commodity. A British or French ship unlading coffee or coal within the 12-mile limit, and before entry and permission to unlade, would be just as guilty of violating these acts as if she were unlading liquor. Neither her nationality nor the nature of her cargo would have any bearing on the issues.
Whether therefore the Senate and the Executive may constitutionally enact criminal legislation by the device of a mere treaty is a question which fortunately we need not discuss. It is sufficient to conclude that the American-British Treaty did not in fact enact new criminal legislation.
There are other considerations which should be noted. It is conceded that a sale was made; that the supercargo sold the cases of liquor to the government agent aboard the government sea sled and received $550. This transaction was on the high seas and 7 miles beyond the 12-mile limit and at a place where the transaction was valid. Title therefore passed. Can it be claimed that there was a violation either by schooner or cargo (for these libels are against them) of any *846 law of the United States? After the sale, title to the goods vested in the government men. Under section 593 is it claimed they smuggled the goods into this country? If they did not, there was no violation of United States law  certainly none by cargo or schooner or even by the men aboard who made the sale, as they all lost title when the goods were bought and paid for, and, of course, no one claims the government men smuggled the liquor. The whole situation seems a perfect paradox. The respondents plead entrapment as a defense, and urge it strenuously in the brief. In view of the conclusions above reached, it is not necessary to discuss at length this question. It is sufficient to say that there is much merit in the defense when considered in connection with the above proposition that when the title to the goods passed and became vested in the purchasers, the respondents could not smuggle what they sold, and which they would not have sold had they not been importuned by the men on the sea sled.
The considerations as above expressed therefore impel the conclusion that there is no legal basis for these libels, and it follows that they must be and the same are dismissed. Submit findings and decree.