### FORD et al. v. UNITED STATES. *

(Circuit Court of Appeals, Ninth Circuit. January 4, 1926.)

No. 4602.

**1. Indictment and information ⬅119—Indictment held sufficient to charge conspiracy to violate Tariff Act and National Prohibition Act.**

Indictment *held* sufficient to charge, under Criminal Code, § 37 (Comp. St. § 10201), a conspiracy to violate Tariff Act 1922, § 593, subd. (b), being Comp. St. Ann. Supp. 1923, § 5841h13, and the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), by importing intoxicating liquors; reference therein to treaty with Great Britain of May 22, 1924, being surplusage.

**2. Intoxicating liquors ⬅138—Importing liquor is unlawful.**

Under National Prohibition Act, tit. 2, § 3 (Comp. St. Ann. Supp. 1923, § 10138½aa), and Act Nov. 23, 1921, § 2 (Comp. St. Ann. Supp. 1923, § 10138½aaa), it is unlawful to import liquor.

*Certiorari granted 46 S. Ct. 475, 70 L. Ed. ——.

**3. Conspiracy ⬤➣43(6)—Offense need not be stated with particularity required in indictment charging offense itself.**

Offense which it is charged defendants conspired to commit need not be stated with that particularity that would be required in indictment charging the offense itself.

**4. Indictment and information ⬤➣71—Sufficient recital of details required to enable defendants to make defense, and to protect them against another prosecution.**

Indictment for conspiracy, under Criminal Code, § 37 (Comp. St. § 10201), must state charge with sufficient recital of details to enable defendants to make their defense, and to protect them in event of second prosecution.

**5. Treaties ⬤➣14—Violation of treaty not a criminal offense.**

Violation of treaty between the United States and Great Britain of May 22, 1924, cannot be a criminal offense.

**6. Indictment and information ⬤➣125(5½)—Competent to charge conspiracy to violate more than one penal statute.**

It is competent to charge a conspiracy to violate more than one penal statute.

**7. Conspiracy ⬤➣43(12)—Conviction warranted if evidence proves conspiracy to violate one statute named.**

Where conspiracy to violate more than one penal statute is charged, a conviction is warranted if evidence proves a conspiracy to violate one of the statutes named.

**8. Criminal law ⬤➣98—Presence of defendant held sufficient to vest District Court with jurisdiction.**

Presence of defendants in court when case was tried was sufficient to vest the District Court with jurisdiction over their persons.

**9. Criminal law ⬤➣335—Incumbent on government to prove defendants parties to crime within court's jurisdiction.**

In prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) and the Tariff Act 1922, § 593, subd. (b), being Comp. St. Ann. Supp. 1923, § 5841h13, government must prove that defendants were parties to crime committed in the district.

**10. Conspiracy ⬤➣47—Criminal law ⬤➣564(1) —Evidence held sufficient to show conspiracy and prove one at least of overt acts within jurisdiction of court.**

Evidence held sufficient to show existence of conspiracy to import and possess liquor, and to prove overt acts alleged, at least one of which took place in the Northern district of California.

**11. Criminal law ⬤➣113—Prosecution maintained either where conspiracy was formed or where one or more of overt acts took place.**

A prosecution under Criminal Code, § 37 (Comp. St. § 10201), may be maintained either at the place where the conspiracy was formed or where one or more of the overt acts took place.

**12. Conspiracy ⬤➣41—One physically without jurisdiction may be party to crime committed therein.**

In view of Rev. St. § 731 (Comp. St. § 1024), principle that one physically without the jurisdiction may be a party to a crime committed therein is applicable to prosecution for conspiracy.

**13. Treaties ⬤➣8—Speed of vessel assisting in discharge of liquor determines distance from coast that liquor-bearing vessel may be seized.**

American-British Treaty of May 22, 1924, permits search and seizure of British ships within such distance from our shores as can be traversed in one hour by any of the boats on which they discharge their liquor.

**14. Treaties ⬤➣8—Implied agreement that United States will not search or seize British vessels without limits fixed by treaty.**

American-British Treaty of May 22, 1924, authorizing search and seizure of vessels endeavoring to bring liquor into the United States in violation of its laws, implies that United States will not search or seize them without limits fixed.

**15. Criminal law ⬤➣736(1)—Function of court to determine what evidence is admissible.**

It is the function of the court to determine what evidence is admissible.

**16. Criminal law ⬤➣736(1)—Court must determine facts necessary to be determined in passing on objections to testimony.**

As the court must determine what evidence is admissible, it must determine for itself facts necessary to be determined in passing on objection to testimony offered.

**17. Criminal law ⬤➣395—Defendants held not to have sustained burden of proof on issue of suppression of evidence of liquors seized.**

Where under American-British Treaty of May 22, 1924, British vessel was subject to search and seizure, if she was within 6.6 miles of American shore line, defendants, moving to suppress evidence, *held* not to have sustained burden of proving that vessel was more than 6.6 miles from shore.

**18. Criminal law ⬤➣395—On motion to suppress evidence, burden of proof was on defendants.**

In prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) and Tariff Act 1922, § 593, subd. (b), being Comp. St. Ann. Supp. 1923, § 5841h13, burden of proof on issue of suppression of evidence of liquor seized *held* to be on defendants, who must show some good reason for suppressing it.

**19. Criminal law ⬤➣404(4)—Ordinarily liquor kept for sale and in possession of defendants is admissible in evidence.**

In prosecution for conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), liquor kept for sale and in possession of defendants is ordinarily admissible in evidence.

**20. Criminal law ⬚656(5)—Court's remark, in passing on testimony, that there had been perjury, held without prejudice to defendants.**

Where testimony on issue as to distance from shore vessel was seized was utterly irreconcilable, and conflict was not due to any mistake in recollection, court, in passing on issue as to admissibility of evidence, did not prejudice defendants in stating that it must be apparent that there had been perjury in the case.

**21. Criminal law ⬚656(1)—Federal practice justifies trial court in commenting on testimony.**

The federal practice justifies the trial court in commenting on the testimony.

**22. Criminal law ⬚395—Intoxicating liquors ⬚247—Seizure of British vessel held justified, and liquor seized admissible.**

Where another vessel was at side of British vessel, engaged in attempt to transfer liquor to the California coast, seizure of British vessel was justified under American-British Treaty of May 22, 1924, and Tariff Act 1922, § 586 (Comp. St. Ann. Supp. 1923, § 5841h5), and liquor seized was admissible in prosecution for conspiracy.

**23. Conspiracy ⬚45—Testimony about liquor secured from vessel and delivered to defendant held admissible.**

In prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) and the Tariff Act of 1922, testimony of witness about liquor secured by him from vessel and delivered to defendant *held* admissible.

**24. Indictment and information ⬚169—Evidence of acts in furtherance of conspiracy by defendants' corporation held admissible.**

Where indictment under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) and the Tariff Act of 1922, charged that defendants conspired with parties to grand jury unknown, it was competent to receive evidence of acts in furtherance of conspiracy by others than defendants.

**25. Conspiracy ⬚47—Evidence held sufficient to sustain conviction.**

In prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) and the Tariff Act of 1922 by unlawfully importing intoxicating liquor, evidence *held* sufficient to sustain conviction.

**26. Criminal law ⬚422(9)—Admission of mutilated $1 bills on which lists of liquor were written held not error.**

On trial for conspiracy to import liquors, admission of $1 bills on which lists of liquor were written and which had been clipped in two and then pasted together, *held* not error, as against defendant who left them at a bank after conspiracy was at an end.

**27. Criminal law ⬚423(1)—Logs of vessel seized held competent.**

In prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) and the Tariff Act of 1922, by unlawfully importing liquor, where prima facie showing of conspiracy was made, there was no error in receiving in evidence logs of British vessel seized.

**28. Criminal law ⬚423(1)—Declarations of one conspirator held admissible against all.**

Declarations of one conspirator with reference to acts in furtherance of the conspiracy are admissible against all.

**29. Criminal law ⬚390—Refusal to permit defendants to testify they did not believe their acts unlawful not erroneous.**

In prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) and the Tariff Act of 1922, in unlawfully importing intoxicating liquor, there was no error in refusing to permit defendants to testify that they did not believe their acts to be unlawful.

**30. Criminal law ⬚1172(7)—Instruction as to duty of vessel's officers and crew to obey held favorable to defendants.**

Charge that mates and crew of vessel were bound to obey lawful orders of captain and officers, and even unlawful orders, unless they knew them to be unlawful, *held* more favorable to defendants than they were entitled to.

**31. Criminal law ⬚313—Officers of vessel carrying liquor, hovering off coast, chargeable with knowledge of our laws.**

The officers of a vessel carrying liquor and hovering off our coast are chargeable with knowledge of our laws.

**32. Criminal law ⬚38—One cannot escape criminal responsibility by contract to obey orders of a wrongdoer.**

A party cannot escape criminal responsibility for his acts by entering into a contractual relation under which he obligates himself to obey orders of a wrongdoer.

**33. Witnesses ⬚277(4) — Refusal to permit officer to be cross-examined as to his court-martial not erroneous.**

Where there was nothing in direct examination of captain of vessel on the subject, there was no error in refusal to permit him to be cross-examined as to grounds on which he had been court-martialed; fact that he had been court-martialed being admitted.

**34. Criminal law ⬚444—Circumstances held sufficient to constitute prima facie authentication of telegram.**

Circumstances *held* sufficient to constitute prima facie authentication of telegram purporting to have been sent by defendant.

**35. Criminal law ⬚444—Before telegram received in evidence, proof must connect it with its alleged author.**

Before telegram can be received in evidence, there must be some proof connecting it with

its alleged author; but necessary proof may consist of circumstantial evidence.

**36. Criminal law ⊜⟹1134(2)—In reviewing ruling admitting telegram in evidence, evidence subsequently received must be considered.**

In reviewing ruling of District Court receiving telegram in evidence, it is duty of the appellate court to consider evidence subsequently received.

**37. Criminal law ⊜⟹814(7)—Charge held not to direct conviction, if defendants were found parties to conspiracy formed in Canada.**

Charge *held* not to direct jury to convict, if it found defendants parties to conspiracy formed in Canada, when indictment charged conspiracy formed in San Francisco Bay.

**38. Criminal law ⊜⟹845—General exception to charge, covering single proposition, is sufficient.**

When an instruction covers a single proposition of law, general exception to it is sufficient.

**39. Criminal law ⊜⟹845—Exception to charge should be sufficiently specific to direct attention to legal questions reserved.**

When an exception is reserved to a considerable portion of the charge, exception should be sufficiently specific to direct attention of trial court to the legal questions which it is desired to reserve.

McCamant, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the Southern Division of the Northern District of California; John S. Partridge, Judge.

George Ford and others were convicted of conspiracy to violate the National Prohibition Act and they bring error. Affirmed.

See, also, 3 F.(2d) 643.

Plaintiffs in error and 55 others were indicted for conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.). A number of the defendants named in the indictment were not apprehended. The defendants Salvadore Crivello and Marino Crivello pleaded guilty. Twenty-nine of the defendants were tried; 19 of them were acquitted, and 10, including the 5 plaintiffs in error, were convicted. Ford, Harris, and Evelyn were respectively the master and first and second officers of the Quadra, a British vessel of Canadian registry. On the 12th of October, 1924, this vessel was seized by the revenue cutter Shawnee as a rum runner operating within a prohibited distance of the Farallone Islands. It is the theory of the government that Quartararo, Belanger, and others who have sued out no writs of error were co-operating with the officers of the Quadra and

other rum-running vessels in landing liquor on the California coast pursuant to a conspiracy for such purpose.

Kenneth M. Green, Harold C. Faulkner, and James B. O'Connor, all of San Francisco, Cal., for plaintiffs in error Ford, Harris, and Evelyn.

Nathan C. Coghlan, of San Francisco, Cal. (Edward A. O'Dea, of San Francisco, Cal., of counsel), for plaintiff in error Quartararo.

George J. Hatfield, U. S. Atty., and T. J. Sheridan, Asst. U. S. Atty., both of San Francisco, Cal.

Before GILBERT, HUNT, and McCAMANT, Circuit Judges.

McCAMANT, Circuit Judge (after stating the facts as above). [1] Error is assigned on the overruling of a demurrer to the indictment and the denial of a motion to quash the indictment. The charge was a violation of section 37 of the Criminal Code (Comp. St. § 10201), which is as follows: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

The indictment alleges the enactment of the National Prohibition Act and the Tariff Act of September 21, 1922 (42 Stat. 858), also the negotiation of the treaty between Great Britain and the United States of date May 22, 1924 (43 Stat. 1761). Subdivision (b) of section 593 of the Tariff Act (Comp. St. Ann. Supp. 1923, § 5841h13), and sections 1, 2, and 3 of article 2 of the treaty are quoted. It is alleged that the Farallone Islands are an American possession situate about 25 miles west of San Francisco. The indictment then charges:

That the 60 defendants, "and divers other persons to this grand jury and these grand jurors unknown, did at the bay of San Francisco, within the district and division aforesaid, and within the jurisdiction of this court, on the 1st day of January, 1924, the real and exact date of which is to this grand jury and these grand jurors unknown, and continuously at all the times thereafter up to and including the date of the filing of this indictment, willfully, unlawfully, feloniously, and knowingly conspire, combine, confederate, and agree together, and with divers other

persons whose names are to these grand jurors and to this grand jury unknown, to commit certain offenses against the United States that is to say:

"(a) To willfully, unlawfully, feloniously, and knowingly sell, transport, import, deliver, furnish, and possess within the United States intoxicating liquor for beverage purposes, to wit, whisky, wine, champagne, gin, and beer containing one-half of 1 per centum and more of alcohol by volume and fit for use and intended for use for beverage purposes within the United States, the said acts to be then and there unlawful and prohibited, and contrary to the provisions of the act of October 28, 1919, known as the 'National Prohibition Act,' and the convention, agreement, and treaty between the United States and Great Britain of May 22, 1924, and intended for use for beverage purposes in violation of said act and said treaty;

"(b) Willfully, unlawfully, feloniously, knowingly and fraudulently import and bring into the United States, and to assist in importing and bringing into the United States merchandise contrary to law, to wit, whisky, champagne, wine, gin, and beer containing one-half of 1 per centum and more of alcohol by volume and fit for use and intended for use for beverage purposes within the United States, the said acts to be then and there unlawful and prohibited and contrary to the provisions of section 593, subdivision (b), of the Tariff Act of 1922, and the convention, agreement, and treaty between the United States and Great Britain of May 22, 1924, and intended to be imported and brought into the said United States in violation of said acts and treaty."

It is alleged that the conspiracy was continuously in operation from January 1, 1924, to the date of the filing of the indictment, which was November 20, 1924. Four overt acts in furtherance of the conspiracy are then set up:

(a) That the Quadra was loaded at Vancouver, B. C., in September, 1924, with 12,000 cases of liquor, which were carried to a point near the Farallone Islands, where a portion of the cargo was transferred to motorboats named, which carried the liquor into the United States.

(b) That on the 29th day of September the Quadra delivered a barrel containing 100 gallons of whisky to the motorboat 903–B, which transported the whisky to San Francisco.

(c) That on the 11th day of October the Quadra delivered to the same motorboat a named quantity of alcohol, gin, brandy, whisky, and vermouth, which was transported to San Francisco.

(d) That on the 12th day of October the Quadra delivered to the defendants Pensotti and McKinzie on the motorboat C–55 89 sacks of whisky and one case of beer, which the said defendants attempted to transport into San Francisco Bay. It is charged that this delivery was made near the Farallone Islands, and at a less distance therefrom than could be traversed by the Quadra and the C–55 in an hour.

Plaintiffs in error contend that the indictment is defective, in that it does not specify the respect in which the importation of the liquor was contrary to the provisions of section 593, subd. (b), of the Tariff Act of 1922. In support of this objection Keck v. U. S., 172 U. S. 434, 19 S. Ct. 254, 43 L. Ed. 505, is cited. The charge in that case was importing diamonds "contrary to law." This case is distinguished in Miller v. U. S. (C. C. A.) 300 F. 529, on the ground that it is presumably lawful to import merchandise and unlawful to sell or possess liquor

[2] It is unlawful to import liquor. Section 3 of title 2 of the National Prohibition Act, 41 Stat. 308 (U. S. Comp. St. Ann. Supp. 1923, § 10138½aa); section 2, Act Nov. 23, 1921, 42 Stat. 222 (Comp. St. Ann. Supp. 1923, § 10138½aaa).

[3] The charge in this case is not smuggling, but conspiracy. "The offense which it is charged the defendant conspired to commit need not be stated with that particularity that would be required in an indictment charging the offense itself." Anderson v. U. S., 260 F. 557, 558, 171 C. C. A. 341, 342; Rulovitch v. U. S. (C. C. A.) 286 F. 315, 317; Taylor v. U. S. (C. C. A.) 2 F.(2d) 444, 446.

[4] The defendants were entitled to be apprised of the charge against them with a sufficient recital of detail to enable them to make their defense, and to protect them in a plea of former acquittal or conviction in the event of a second prosecution for the same offense. We think a conspiracy to violate the Tariff Act is sufficiently charged. A conspiracy to violate the National Prohibition Act is unquestionably charged.

[5] It is argued that there can be no criminal offense in violating the treaty between this country and Great Britain. This is true, but the reference to the treaty may be rejected as surplusage, and the indictment still states facts sufficient to constitute a crime. Bailey v. U. S. (C. C. A.) 5 F.(2d)

437; Remus v. U. S. (C. C. A.) 291 F. 501; U. S. v. Weiss (D. C.) 293 F. 992, 995; U. S. v. Drawdy (D. C.) 288 F. 567, 570. Plaintiffs in error cite Torphy v. State, 187 Ind. 73, 118 N. E. 355, where the Indiana court reversed a conviction because the indictment improperly charged that defendant had been previously convicted. Such an allegation would be manifestly damaging, but the reference to the treaty in this indictment could not have prejudiced these plaintiffs in error.

[6, 7] It is competent to charge a conspiracy to violate more than one penal statute. U. S. v. Rabinowich, 238 U. S. 78, 86, 35 S. Ct. 682, 59 L. Ed. 1211; Frohwerk v. U. S., 249 U. S. 204, 210, 39 S. Ct. 249, 63 L. Ed. 561; Remus v. U. S. (C. C. A.) 291 F. 501; Powers v. U. S. (C. C. A.) 293 F. 964; Taylor v. U. S. (C. C. A.) 2 F.(2d) 444, 447; Bailey v. U. S. (C. C. A.) 5 F.(2d) 437. A conviction is warranted in such case, if the evidence proves a conspiracy to violate one of the statutes named. Kepl v. U. S. (C. C. A.) 299 F. 590. The District Court did not err in overruling the demurrer and denying the motion to quash the indictment.

[8] It is the contention of plaintiffs in error that the seizure of the Quadra was wrongful, for the reason that the vessel, at the time she was seized, was on the ocean beyond the reach of the laws of the United States, and her officers and crew were British subjects. It is earnestly argued that for these reasons the District Court had no jurisdiction of the persons of plaintiffs in error Ford, Harris, and Evelyn. It appears that on the seizure of the Quadra the vessel, and her officers and crew, were brought to San Francisco against their will. The defendants were present in court when the case was tried; this was sufficient to vest the District Court with jurisdiction over their persons. The question presented on this record is not whether their arrest was regular, but whether they were guilty and were fairly tried. "The jurisdiction of the court in which the indictment is found is not impaired by the manner in which the accused is brought before it." Mahon v. Justice, 127 U. S. 700, 708, 8 S. Ct. 1204, 1208 (32 L. Ed. 283); Cook v. Hart, 146 U. S. 183, 13 S. Ct. 40, 36 L. Ed. 934; Adams v. New York, 192 U. S. 585, 24 S. Ct. 372, 48 L. Ed. 575; Pettibone v. Nichols, 203 U. S. 192, 27 S. Ct. 111, 51 L. Ed. 148, 7 Ann. Cas. 1047. See, also, Ker v. Illinois, 119 U. S. 436, 444, 7 S. Ct. 225, 30 L. Ed. 421.

In Latham v. U. S., 2 F.(2d) 208, 210, the Circuit Court of Appeals for the Fourth Circuit says: "The defendants being under arrest in the United States, it makes no difference that they were outside the jurisdiction when, by aiding and abetting, they become principals in crime committed in the United States. They could not have been extradited as fugitives from justice, because they had not fled from the United States; but, being under arrest in the jurisdiction, they could be tried and convicted as participants in the crime."

[9] The question of venue is less readily answered. It was incumbent on the government to prove that these plaintiffs in error were parties to a crime committed in the Northern district of California.

[10] The indictment charges a conspiracy entered into at San Francisco Bay, within the said district, and continuing from January 1 to November 20, 1924. The purpose of the conspiracy was to violate the Prohibition and Tariff Acts, by importing, selling, and possessing intoxicating liquor in said district.

Evidence was received that in April or May, 1924, the plaintiff in error Quartararo employed the defendant Sam (Salvadore) Crivello to carry liquor in the motorboats Skidaddle and California from a point outside the Farallones to Oakland creek and Pacific City, which are points within the Northern district of California, Southern division. This was a continuing employment. Under it Crivello received liquor from the Norburn, the Malahat, and the Quadra. Quartararo introduced Crivello to plaintiff in error Belanger, and the latter actively co-operated in the enterprise. At the instance of Belanger, Crivello transported sacks from the city to the Malahat, from which vessel they were removed to the Quadra. These sacks were suitable containers for bottled liquor, and were so used. There was evidence that Belanger had some control over the Malahat and the Quadra. He gave written orders to transfer liquor from one vessel to the other, and orders also to bring cargo ashore.

Marino Crivello, brother of Sam, was subsequently employed by Belanger to transport liquor from the Quadra to Drake's Bay in Marino's boat, the Marconi. The evidence shows a number of deliveries of liquor from the Norburn, the Malahat, and the Quadra, and there is no evidence that money passed at the time when the deliveries were made. The deliveries of liquor were in fulfillment of orders designated by number. This is not the simple case of the sale and delivery of liquor

on the high seas by a foreign vessel. The deliveries were made pursuant to prearrangement. There is no evidence that any one from these vessels came ashore, and no evidence that either Quartararo or Belanger visited the vessels. The Kiltuish came out to the Quadra from time to time to supply her with oil. This service was manifestly rendered pursuant to an arrangement previously made therefor.

It appears that the Malahat left Vancouver, B. C., May 23, 1924, with a cargo of liquor destined to Buenaventura, Columbia; the Coal Harbor left the same port with a similar cargo July 5, 1924, destined to La Libertad, San Salvador, and the Quadra left Vancouver September 9, 1924, destined to La Libertad, and carrying a large cargo of miscellaneous liquors. The shipper of all these cargoes was Consolidated Exporters' Corporation, Limited, a Canadian corporation. It was incorporated August 24, 1922. Among the stated "objects for which the company is established" are these: "(a) To take over as a going concern assets of David Liquor Company, Limited, * * * Nat. Bell Liquor Company, Limited, * * * B. C. Liquor Company, Limited, and Dominion Liquor Company, Limited. (b) To import, export, and deal in wines and alcoholic * * * beverages of all kinds, * * * in so far as the law allows the same to be done."

The annual report of this corporation made as of date October 31, 1923, shows that plaintiff in error Belanger was one of its directors. Accompanying the report is a certificate that on the 2d of June, 1924, one M. Ripstein had ceased to hold office as director. There is no corresponding showing as to Belanger, and the inference is warranted that he was a director in this corporation during the summer and early autumn of 1924.

Instead of proceeding to the destination named in their papers, the Malahat, the Coal Harbor, and the Quadra all proceeded to a point on the high seas off the Golden Gate. They there exchanged liquor with each other, and the Malahat and the Quadra delivered liquor to small vessels for transportation to the shore.

On the entire case the conclusion is warranted that about the 1st of May, 1924, Quartararo and Sam Crivello, within the Northern district of California, conspired to import and possess liquor; that Belanger and his corporation either had an understanding with Quartararo at that time, or

shortly thereafter became parties to the conspiracy; and that the departure of the Quadra with her cargo from Vancouver on the 9th of September was pursuant to the same conspiracy. Three of the four overt acts alleged in the indictment are clearly proved, and at least one of them took place in the Northern district of California.

[11, 12] It is well settled that a prosecution under section 37 of the Criminal Code may be maintained, either at the place where the conspiracy was formed or where one or more of the overt acts took place. Hyde v. U. S., 225 U. S. 347, 362, 363, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; Brown v. Elliott, 225 U. S. 392, 400, 32 S. Ct. 812, 56 L. Ed. 1136; Jianole v. U. S. (C. C. A.) 299 F. 496, 498; Latham v. U. S. (C. C. A.) 2 F.(2d) 208; Horwitz v. U. S. (C. C. A.) 5 F.(2d) 129. One physically without the jurisdiction may be a party to a crime committed therein. Burton v. U. S., 202 U. S. 344, 387, 389, 26 S. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 392; Strassheim v. Daily, 221 U. S. 280, 284, 285, 31 S. Ct. 558, 55 L. Ed. 735. This principle is applicable to prosecutions for conspiracy. Dealy v. U. S., 152 U. S. 539, 546, 14 S. Ct. 680, 38 L. Ed. 545.

It is argued that the above authorities, or some of them, are based upon section 731 of the Revised Statutes (Comp. St. § 1024), which is as follows: "When any offense against the United States is begun in one judicial district and completed in another, it shall be deemed to have been committed in either, and may be dealt with, inquired of, tried, determined, and punished in either district, in the same manner as if it had been actually and wholly committed therein."

It is contended that there is a distinction between a conspiracy formed in one state, which is carried out in another state, and a conspiracy formed or effected in a foreign country. In this case we are concerned with a conspiracy formed in the Northern district of California, which was effected in part by acts which took place in Canada and on the high seas. Dealy v. U. S., 152 U. S. 539, 547, 14 S. Ct. 680, 683, 38 L. Ed. 545, is in point. It was contended in that case that the overt acts relied on were all committed in Canada. The court said: "If the conspiracy was entered into within the limits of the United States and the jurisdiction of the court, the crime was then complete, and the subsequent overt act in pursuance thereof may have been done anywhere."

In Horwitz v. U. S. (C. C. A.) 5 F.(2d)

129, the District Court for Massachusetts was held to have jurisdiction to try a conspiracy charge, when the acts effectuating the conspiracy took place for the most part in a foreign country and on the high seas. The District Court has jurisdiction to try this case, and there was no error in denying the motions for a directed verdict.

[13] Liquor on the Quadra was seized. A petition was filed to suppress this evidence, and when the petition was denied an objection and exception were reserved to receiving the liquor in evidence. The contention of plaintiffs in error is that at the time of the seizure the Quadra was 13½ miles distant from the nearest point on the Farallone Islands. The treaty between Great Britain and this country, ratified May 22, 1924, contains the following provisions:

## "Article II.

"(1) His Britannic Majesty agrees that he will raise no objection to the boarding of private vessels under the British flag outside the limits of territorial waters by the authorities of the United States, its territories or possessions in order that enquiries may be addressed to those on board and an examination be made of the ship's papers for the purpose of ascertaining whether the vessel or those on board are endeavoring to import or have imported alcoholic beverages into the United States, its territories or possessions in violation of the laws there in force. When such enquiries and examination show a reasonable ground for suspicion, a search of the vessel may be instituted.

"(2) If there is reasonable cause for belief that the vessel has committed or is committing or attempting to commit an offense against the laws of the United States, its territories or possessions prohibiting the importation of alcoholic beverages, the vessel may be seized and taken into a port of the United States, its territories or possessions for adjudication in accordance with such laws.

"(3) The rights conferred by this article shall not be exercised at a greater distance from the coast of the United States, its territories or possessions than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense. In cases, however, in which the liquor is intended to be conveyed to the United States, its territories or possessions by a vessel other than the one boarded and searched, it shall be the speed of such other vessel and not the speed of the vessel boarded, which shall determine the distance from the coast at which the right under this article can be exercised."

[14] This treaty is an agreement between the two nations defining the limits within which British vessels may be searched and seized. There is an implied agreement that this country will not search or seize them without the limits fixed. The Frances Louise (D. C.) 1 F.(2d) 1004; The Marjorie E. Bachman (D. C.) 4 F.(2d) 405; The Sagatind (D. C.) 4 F.(2d) 928; La Ninfa, 75 F. 513, 21 C. C. A. 434.

On the 17th of February, 1925, the witness August Anderson made a test of the speed of the C–55; he testified that her average speed was 6.6 knots per hour. The government's evidence was that the Quadra was seized at a point 5.7 knots from the nearest point in the Farallones. There was evidence that the C–55 had received liquor from the Quadra, and the inference was plain that it was the intention to transport this liquor to San Francisco. The government therefore contends that the seizure was warranted by the position in which the Quadra was found. The officers of the Quadra testified that at the time of the seizure the vessel was 13½ miles from the nearest point of the Farallones.

[15, 16] Plaintiffs in error contend that the question was one for the jury, and they reserved exceptions to the refusal of the court to charge the jury on the subject. The question arose on the admissibility of evidence, and it is the function of the court to determine what evidence is admissible. It follows that the court must determine for itself the facts necessary to be determined in passing on objections to testimony offered. The Supreme Court has recently so held. Steele v. U. S., 267 U. S. 505, 511, 45 S. Ct. 417, 69 L. Ed. 761.

The evidence shows that the C–55 had no load when her speed was tested on the 17th of February, and an objection was reserved to any evidence of her speed, unless the evidence was confined to conditions substantially identical with those obtaining at the time of the seizure. This contention is supported by The Over the Top, 5 F.(2d) 838, a decision rendered by the District Court for Connecticut. We think this construction of the treaty is unwarranted by the language used: "The rights conferred by this article shall not be exercised at a greater distance from the coast of the United States, its territories, or possessions than can be traversed in one hour by the vessel."

We do not find any qualifying words after "vessel," such as "when loaded," or "un-

der conditions of wind and tide prevailing at the time of seizure." We should not read into the treaty limitations which have not been written therein. The courts of this country should be careful not to fritter away by construction concessions secured by the State Department for the purpose of combating the rum-running abuse. The treaty, fairly construed, embodies the consent of Great Britain that her ships may be searched and seized under proper conditions within such a distance from our shores as can be traversed in an hour by any of the boats on which they discharge their liquor. The evidence shows that the C–55 can traverse 6.6 knots within that time. The Quadra was therefore subject to search and seizure if she was within 6.6 miles of the Farallones.

[17] The testimony on this subject is in hopeless conflict. Capt. Howell and Ensign Morse, of the Shawnee, testify that at the time of the seizure they took the bearings of Point Reyes and the North Farallones. With the aid of these bearings the position of the Quadra was platted on the chart and found to be 5.7 nautical miles from the North Farallones. This result was checked by taking a sounding. The depth of water was found to be 44 fathoms. This was the depth of water as shown on the official chart at the point indicated by the calculations.

On the other hand, plaintiffs in error Harris and Evelyn, first and second officers of the Quadra, testify that they took bearings of Point Reyes and the South Farallones lighthouse. Their calculations, based on these observations, were checked by R. Levez, an expert residing in San Francisco, who testified that, if these bearings were correctly taken, the Quadra was distant 13.6 miles from the nearest point in the Farallones at the time of the seizure.

Testimony was also offered to show that the sounding relied on by the government was not taken at the place of the seizure, but was taken while the Quadra was being towed into San Francisco Bay, and after the tow had been in progress for an hour and a half. The government countered this evidence by testimony that Jacob Schybinger, the witness who so testified for the defendants, was in the engine room of the Shawnee at the time when he said the sounding was taken, and that he could not have seen what was happening on deck.

[18, 19] The burden of proof was on plaintiffs in error. In a prosecution for conspiracy to violate the Prohibition Act, liquor kept for sale and in the possession of the defendants is ordinarily admissible in evidence. Plaintiffs in error, in seeking the suppression of this evidence, must show some good reason for suppressing it. The District Court heard and saw the witnesses. We cannot say on this record that he erred in holding that plaintiffs in error had not sustained the burden which the law laid upon them on this issue.

[20] In passing on this question the District Court used the following language: "Of course, it must be apparent to anybody that there has been perjury in this case. Whatever my personal views may be in regard to it, the testimony that has been given here by the officers of the Shawnee and the testimony that has been given here by the two others that were produced cannot both be true in regard to that sounding. * * * The court will find that the ship was seized within the limits provided by the treaty with Great Britain." An exception was reserved to the language used. Plaintiffs in error are mistaken in assuming that the reference to perjury was applicable to the testimony of Harris and Evelyn. It manifestly referred to the testimony of Schybinger and Gisbourne, a member of the crew of the Quadra who corroborated him. Gisbourne was a defendant, but he was acquitted.

[21] The testimony with reference to the sounding was utterly irreconcilable, and the conflict was not due to any mistake in recollection. The court, moreover, was passing on an issue which was for determination by him, and not by the jury. The federal practice justifies the trial court in commenting on the testimony. The language excepted to was perhaps ill chosen, but it did not involve such prejudice to Harris and Evelyn as to call for the reversal of the judgment as to them.

[22] Assuming that the position of the Quadra was as testified by Capt. Howell and Ensign Morse, the seizure was warranted by the provisions of the treaty above quoted and section 586 of the Tariff Act of September 21, 1922 (Comp. St. Ann. Supp. 1923, § 5841h5), which is in part as follows: "The master of any vessel from a foreign port or place who allows any merchandise (including sea stores) to be unladen from such vessel at any time after its arrival within four leagues of the coast of the United States and before such vessel has come to the proper place for the discharge of such merchandise, and before he has received a permit to unlade, shall be liable to a penalty equal to twice the value of the merchandise but not

less than $1,000, and such vessel and the merchandise shall be subject to seizure and forfeiture."

The day preceding the seizure the Quadra had discharged a part of her cargo of liquor in the 903–B, and this vessel was seized in San Francisco Bay while attempting to land the liquor. At the time the Shawnee overtook the Quadra, the C–55 was hove to at her side with a supply of liquor received from the Quadra. There was a present attempt to transfer liquor from the Quadra to the California coast. This justified the seizure. The Pictonian (D. C.) 3 F.(2d) 145.

Capt. Ford, of the Quadra, refused to show his papers as required by section 1 of article 2 of the treaty, and by section 2 of the same article Capt. Howell was warranted in taking the Quadra into a United States port for adjudication of her status in accordance with our laws. The facts certainly made out a case of "reasonable cause for belief that the vessel has committed or is committing or attempting to commit an offense against the laws of the United States * * * prohibiting the importation of alcoholic beverages." The liquor found on the Quadra was properly received in evidence. Canada v. U. S. (C. C. A.) 5 F.(2d) 488.

[23] It is contended that there was error in receiving the testimony of Sam Crivello about the liquor secured by him from the Norburn about the 1st of May, 1924, and delivered to Quartararo at Oakland creek. It is argued that this incident bore no relation to the conspiracy involved in the present prosecution. Plaintiffs in error cite Terry v. U. S. (C. C. A.) 7 F.(2d) 28, and Crowley v. U. S. (C. C. A.) 8 F.(2d) 118. These cases hold that, in a prosecution for conspiracy, the government's evidence must be confined to proof of the conspiracy charged, and the Terry Case holds that "the scope of the conspiracy must be gathered from the testimony." Within these rules we think the testimony as to the Norburn incident was admissible. The government explicitly proved that, prior to Crivello's reception of liquor from the Norburn, he had been employed by Quartararo to receive and transport liquor from various vessels and to deliver it to Quartararo at Oakland creek. Here was clear proof of a conspiracy between these two defendants, within the allegations of the indictment.

[24] The jury was warranted in finding from the evidence that either Belanger and his corporation were originally parties to the conspiracy, or that they and the officers and crew of the Quadra adhered to it subse-quently. The indictment charges that the defendants conspired with other parties to the grand jury unknown. Under this allegation it was competent to receive evidence of acts in furtherance of the conspiracy by Belanger's corporation, Consolidated Exporters' Company, Limited, and the officers and crew of the Malahat and the Coal Harbor. Thomas v. U. S., 156 F. 897, 907, 84 C. C. A. 477, 17 L. R. A. (N. S.) 720.

[25] A majority of the court are of the opinion that there is evidence to sustain the verdict as to the defendant Quartararo, and that there was no error of which he had a right to complain. It is the view of the writer that there was error as to Quartararo in the following matter:

[26] Counsel for the government in his opening statement to the jury said: "We will show you * * * that the individuals in San Francisco who were a part of this conspiracy * * * used a system of $1 bills to secure their cargo; that these bills were clipped in half, one half being delivered to the captain or supercargo of the Quadra, and the other half going out in the small motorboat that went to secure the particular load or cargo called for; these $1 bills having upon their back the list and order for the specific amount, and the kind of liquor that was to be secured from the Quadra; that when they got out there the bills were matched up, and when they were matched up the cargo was delivered to the particular motorboat, and then they brought their cargo right in to San Francisco."

The government proved that about November 10, 1924, some one left 83 $1 bills at the Bank of Italy. These bills had been clipped in two and subsequently pasted together. The party leaving the mutilated bills had requested that they be exchanged for fresh money. It did not appear that Quartararo left them at the bank, but there was proof that indorsements on these bills were in the handwriting of Quartararo. With no other evidence connecting them up with the conspiracy, those bills were received in evidence. There was an entire failure of proof as to the system by which business was transacted on the Quadra, outlined in the opening statement. The bills contained indorsements of lists of liquor.

The quantities of liquor listed on the bills were large, indicating that the party making the lists was trafficking in liquors. For example, one of the bills in Exhibit 31 contained on the front of the bill the following:

"10 Plymouth gin.

  5 Royal George.

  5 Highland Queen.

  2 drums alcohol.

"Not to be filled; only for record on order No. 15."

The indorsement on the back of this bill was:

"30 Burnett's gin.

45 Plymouth gin.

  ——

  75"

The bills were left with the bank about four weeks after the seizure, and at a time when the conspiracy was at an end, so far as the testimony shows. The effect of this testimony was not to connect Quartararo with the conspiracy charged, but to create an inference that he was dealing in intoxicating liquors generally. The writer believes that it was error to receive these bills in evidence, but error prejudicial to Quartararo only. The error was emphasized by a reference to the $1 bills in the charge of the court. In the opinion of the writer, the instruction requested by Quartararo, withdrawing these bills from consideration by the jury, should have been given. Terry v. U. S. (C. C. A.) 7 F. (2d) 28. A majority of the court think otherwise.

[27, 28] Error is assigned on the reception in evidence of logs kept by J. H. Mason, chief engineer of the Quadra, and J. A. McLennan, one of the crew. Both Mason and McLennan were parties defendant. The entries in these logs were made from day to day, while the vessel was proceeding from Vancouver south, and while she was lying off the Farallones. A prima facie showing of conspiracy was certainly made by the government. In such case the declarations of one conspirator with reference to acts in furtherance of the conspiracy are admissible against all. The declarations contained in these logs come within this rule. Thomas v. U. S., 156 F. 897, 909, 910, 84 C. C. A. 477, 17 L. R. A. (N. S.) 720.

[29, 30] Error is assigned on the refusal of the court to permit Harris and Evelyn to testify that they did not believe their acts to be unlawful. At the request of these plaintiffs in error the court charged: "The first and second mate are bound to obey the lawful orders of the master of the ship; the members of the crew are bound to obey the lawful orders of the captain of the ship; and they are bound likewise to obey the lawful orders of the first officer, or, failing him on watch, the second officer. They are bound, gentle-men, even to obey an unlawful order of the master and officers of the vessel, unless they know that it is unlawful. Mere suspicion that the captain or the mates are telling them to do something that is contrary to the law is not sufficient; they are bound to obedience unless they know that what they are doing is unlawful and therefore wrong."

[31, 32] There is an inconsistency between the ruling on evidence and the charge given. We think the charge was more favorable to these plaintiffs in error than they were entitled to, and that the testimony above referred to was properly excluded. The officers of a vessel carrying liquor and hovering off our coasts are chargeable with a knowledge of our laws. A party cannot escape criminal responsibility for his acts by entering into a contractual relation under which he obligates himself to obey the orders of a wrongdoer. These plaintiffs in error testified that they participated in the sacking of cased liquor and the delivery of it to motorboats under orders from Capt. Ford.

[33] An exception was reserved to the refusal of the court to permit Capt. Howell, of the Shawnee, to be cross-examined with reference to the grounds on which he had been court-martialed. There was nothing in his direct examination bearing on this subject, and the court properly excluded the testimony, other than his admission of the fact that he had been court-martialed.

[34] After both sides had rested, the court permitted the case to be reopened, in order that the government might introduce the following telegram purporting to be sent by the defendant Belanger:

"San Francisco, June 24/24.

"Geo. Norgan, Room 1052 Biltmore Hotel, Los Angeles, Calif. Merchandise not yet reached market. Therefore cannot report anything different. Have appointment with Vince to-morrow who will make proposition in morning. Things shaping good. Regards. G. H."

The government contended that "merchandise" meant liquor, and that "Vince" was the defendant Vincent Quartararo. Plaintiffs in error claim that there was an insufficient showing of the authenticity of the telegram.

[35] There is no presumption that a telegram is sent by the party who purports to send it. Before it can be received in evidence, there must be some proof connecting it with its alleged author. Drexel v. True, 74 F. 12, 20 C. C. A. 265; Smith v. Easton, 54 Md.

138, 145, 39 Am. Rep. 355; Cobb v. Glenn Boom Co., 57 W. Va. 49, 49 S. E. 1005, 1008, 110 Am. St. Rep. 734; Burt v. Winona & St. P. R. Co., 31 Minn. 472, 18 N. W. 285, 289. The necessary proof may consist of circumstantial evidence. Oregon Steamship Co. v. Otis, 100 N. Y. 446, 3 N. E. 485, 53 Am. Rep. 221. The original telegram in this case is typewritten. It appeared that it was received at the office of the Postal Telegraph Company at St. Francis Hotel, San Francisco, and that it was sent over the wires. The agent of the telegraph company took the name and address of the sender as "C. H. Belanger, Somerton Hotel." It appeared that Belanger was registered at the Somerton Hotel on the day when the wire was sent. This was as far as the government went in authenticating the wire, but the defendant Belanger offered further proof.

[36] This proof did not deny the authenticity of the wire, but undertook to explain it as relating to something other than the conspiracy charged. It appeared that Belanger had been at Los Angeles on Sunday, June 22, 1924, and in conference there with Norgan, to whom the telegram was addressed. Belanger left Los Angeles on the 22d or 23d of June for San Francisco. He called up the witness H. L. Williams at Los Angeles, and told him he was going to communicate with Norgan. In reviewing the ruling of the court receiving the telegram in evidence, it is our duty to consider this evidence subsequently received. De Witt v. U. S. (C. C. A.) 291 F. 995, 1002. We think that the circumstances were sufficient to constitute a prima facie authentication of the wire, and that it was properly received.

Other telegrams, admittedly sent by Belanger, were also received. Their connection with the conspiracy is not shown, but their contents were not damaging, and we think that this plaintiff in error was not prejudiced by their admission.

[37] Plaintiffs in error excepted generally to the following portion of the charge:

"The indictment in effect charges that a certain corporation formed in a foreign country, to wit, the Dominion of Canada, entered into a plan by which liquor was to be shipped at sea ostensibly and under the provisions of her manifest for delivery in another foreign country, to wit, Mexico. It is charged that that was a mere cloak or blind, and that the real intent and purpose of the shipping of the liquor by various vessels plying out of the harbor of Vancouver was to lie off the coast of the United States and to land the liquor illegally and unlawfully upon our shores.

"It is then charged that in effect Capt. Ford, the chief officer, Mr. Harris, the second officer, Mr. Evelyn, and members of the crew of the Quadra loaded upon that vessel a large quantity of intoxicating liquor, the manifest providing that that liquor was for delivery at La Libertad; that it was the intent and purpose, however, for that ship to come as close as she dared to the coast of California, and to deliver that liquor by means of small boats plying from the ship to the shore in the state of California, for distribution and sale to our citizens.

"It is charged that two persons residing, or at least one of them residing in the state of California and the other sojourning here, and other persons who are not brought before the court, were the means or agency by which that scheme was to be carried out to its end; in other words, that they were to provide the vessels by which the liquor was brought from the ships to the shore, and to provide for its sale and distribution after it was landed on the coast of the state of California.

"Now, gentlemen, if that be true, then I instruct you that every person who in any manner participated in that scheme was guilty of the conspiracy as charged in the indictment."

The exception did not direct the court's attention to the question of venue, nor did plaintiffs in error request any instruction on that subject. It is now contended that the court directed the jury to convict if it found the defendants parties to a conspiracy formed in Canada; whereas, the charge in the indictment is a conspiracy formed at San Francisco Bay. We do not so read the instruction complained of. There is a reference to a corporation formed in Canada, but no reference to a conspiracy whose situs was in Canada. If the jury found the facts to be as outlined in the instruction, it was their duty to convict those who participated in the scheme. The court was not discussing the question of venue.

[38, 39] When an instruction covers a single proposition of law, a general exception to such instruction is sufficient; but when an exception is reserved to a considerable portion of the charge, the exception should be sufficiently specific to direct the attention of the trial court to the legal questions which it is desired to reserve. C. W. Young Co. v. Union Oil Co. (C. C. A.) 293 F. 742. It is also to be said that it was clear, for reasons already pointed out, that if the defendants

were guilty the District Court in which they were tried had jurisdiction of their offense. We find no error in the charge quoted.

It would unduly prolong this opinion to discuss other exceptions and assignments of error. They have all been considered, and we find no error, except that, in the opinion of the writer, the $1 bills should not have been admitted in evidence, and the requested instruction removing them from the consideration of the jury should have been given.

The judgment is affirmed as to all plaintiffs in error; the writer dissenting as to Quartararo.