**VERNA et al. v. UNITED STATES.**

No. 4528.

Circuit Court of Appeals, Seventh Circuit.

Dec. 11, 1931.

Harold J. Bandy, of Granite City, Ill., for appellants.

Frank K. Lemon, U. S. Atty., of Clinton, Ill., and Marks Alexander, Asst. U. S. Atty., of Springfield, Ill.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Appellants, John Verna and Peter, his son, were indicted with six others for violations of the National Prohibition Law (27 USCA). The indictment contained five counts, charging, respectively, illegal manufacture, unlawful possession of property designed for unlawful manufacture, unlawful possession of intoxicating liquor for purpose of sale, maintenance of a common nuisance, and conspiracy to do these things. Two of the defendants were not apprehended, one was dismissed, and the rest were convicted. Only the Vernas appeal.

It appears that on June 16, 1929, federal officers went upon the John Verna farm, near Collinsville, Ill., and found there in active operation stills of much capacity, large quantities of mash and alcohol, and several persons in apparent charge whom they placed under arrest.

■ The evidence was that John was the owner of the farm, which consisted of 15 acres of land, with buildings, grapevines, and fruit trees thereon; that he had resided there for some years; that on February 10, 1929, his wife died, and he then went to stay with Peter, who had shortly before acquired an adjoining farm, with houses on the two farms about a quarter-mile apart. Shortly after going there John wished to rent his farm, and a friend told him he knew of some one who would rent it. Presumably this person, with the friend, saw the farm, and a lease to one Schmidt, with whom John had little or no acquaintance, was thereupon prepared for one year at the price of $1,000—$200 cash and the balance at stipulated times during the term.

John did not get along well with Peter, and a day or two after the lease was executed went to Calhoun county, where his wife's people resided, and remained there for some months, going thence to Alabama, and not returning to Collinsville until some time in September of that year. Shortly before returning to Collinsville, he had been informed of the trouble at his farm, and, at Peter's request, had sent on the lease, which Peter turned over to the federal agents. Before that, the maturing rent being unpaid, John wrote to the friend to collect it for him, but Schmidt, the lessee, was not found, and the rent remained uncollected. Most of these facts appear from John's testimony, and are uncontradicted. There was no evidence that, between March and September, John was in or about Collinsville.

This was all the evidence pro or con with reference to John, with the possible exception that a prohibition agent testified there was a sort of cave in a hill near the residence on John's farm, and that in the cave there was an old still which, judging from its con-

920

dition, the agent thought had been unused for about two years. The inference sought was that John himself had a still there before those which were evidently placed there after the lease. Nobody testified to seeing any still there prior to the lease, and John testified that he knew nothing of such still, and that the cave, afterwards pointed out to him, was not there when he occupied the farm. He also denied all knowledge of any stills on the farm, or of any distilling operations.

In the brief for the government, John's relation to the transaction is treated thus: "The defendant John Verna seemed to think that by the simple act of leaving the neighborhood so that he (Verna) would not be in actual possession of the property when the stills were found would show that he had nothing to do with them. This is an indictment for conspiracy and it is the law that one physically without the jurisdiction of the Court may be a party to a crime committed therein, even though that crime is a conspiracy. (Ford v. United States [C. C. A.] 10 F.(2d) 339, 345)."

The difficulty with this contention is that of the five counts on which John was indicted he was acquitted on four of them, including the conspiracy count, and was convicted only on the nuisance count.

Just how this evidence supports the charge of maintaining a nuisance as against John we cannot perceive. The nuisance section of the statute is: "Any room, house, building, boat, vehicle, structure, or place where intoxicating liquor is manufactured, sold, kept, or bartered in violation of this chapter, and all intoxicating liquor and property kept and used in maintaining the same, is hereby declared to be a common nuisance, and any person who maintains such a common nuisance shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than $1,000 or be imprisoned for not more than one year, or both." Section 21, 41 Stat. 314 (27 USCA § 33).

It does not even remotely appear that John "manufactured, sold, kept, or bartered" intoxicating liquor upon these premises. Nor does it appear that he aided, abetted, induced, commanded, or procured these things to be done on the premises, as was held to be sufficient in Reid v. United States (C. C. A.) 44 F.(2d) 51. In that case knowledge of the violation was brought directly home to the owner of the premises by his frequent presence therein, the transaction of his business there, and the secretive manner in which he and others obtained access to the premises. Here

all the evidence shows that during all the time of the unlawful operations on John's farm he was a long distance away, and there is no evidence tending to indicate that he leased the premises with the knowledge, purpose, or intent that these unlawful operations should be conducted there, or that prior to the raiding of the place any knowledge came to him that the premises were being so used.

While the truth may be that the lease was only a mask and a pretense, and that John, well knowing that these operations would be carried on, executed the lease, and was even to receive a share of the proceeds, yet such possibilities rest in imagination only, and are not supported by any evidence.

■■■ Peter was found guilty on all the counts, but it is very doubtful whether the record discloses sufficient evidence of his guilt on any of them.

In the brief for government, it is insisted that the evidence shows him guilty of conspiracy. But the charge of conspiracy will not support the court's general sentence of three years' imprisonment, following the general verdict of guilty, the maximum imprisonment which under the statute may be imposed for conspiracy being two years. This is also the situation with reference to all the other counts except the first, which charges unlawful manufacture. The others carry maximum penalty of one or two years' imprisonment.

It follows that the judgment against Peter can be sustained only by showing that the evidence sustains the first count, charging manufacture.

The record will be searched in vain for any substantial evidence indicating that Peter manufactured liquor there. It is evident he knew liquor was being made on his father's farm. One of the officers testified that Peter had so told them; his stated reason being that he could see and hear cars being driven into the place at all times of day and night, and that this disturbed him somewhat. No one testified to seeing him on the father's place since the time it was rented, or to his taking any part directly or indirectly in the management of the place, or in the manufacturing operations which were there conducted.

It seems that on one of the pages torn from a memorandum book, evidently belonging to one of those found at the still, there were a number of entries, including telephone numbers, one of which was a telephone number of Peter's residence on the next farm. It was testified by telephone employees that a

number of times there had been calls between that phone and one or two phones at St. Louis which belonged to one of the men who allegedly participated in running the stills. There was no evidence that Peter had ever carried on a conversation, or of what was said in any such conversation. For all that appeared in evidence to the contrary, it may be that use of Peter's telephone in this connection was merely an accommodation to a neighbor, Peter's telephone being probably the nearest to the place where the stills were operated.

Then there was the circumstance that at the time of the raid upon the stills Peter's horse was found there, hitched to a scraper with which a hole was being dug near the barn in which were the stills. One of the officers stated that Peter told him some one had that day hired the horse from him at the price of $5 for the day. Whether this was merely an accommodation or was actually a hiring would make no difference. There was no evidence to indicate what connection, if any, the hole, when completed, would have had with the manufacture of liquor on this farm. Suffice it to say that in the partly completed stage in which it was found it had not theretofore contributed to the manufacture of any liquor that had been made there.

If Peter did in fact have an interest in these distilling operations, the evidence fails to disclose it; and, of course, we are limited by what the record shows. Since we do not find in the record evidence to sustain the only count in the indictment that would support the judgment which was pronounced against Peter, the judgment against him cannot stand.

The judgment as to John Verna and Peter Verna is reversed, and the cause as to them is remanded to the District Court for another trial.